T.C. Memo. 2009-145


UNITED STATES TAX COURT


KIVA DUNES CONSERVATION, LLC, E.A. DRUMMOND, TAX MATTERS PARTNER,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13196-06.                    Filed June 22, 2009.


David M. Wooldridge, for petitioner.

Linda J. Wise and John W. Sheffield, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:  By notice of final partnership administrative adjustment (FPAA), respondent disallowed a charitable contribution deduction claimed by Kiva Dunes Conservation LLC (Kiva Dunes) for its grant to the North American Land Trust (NALT) of a perpetual conservation easement covering a golf

course that it owned.  Respondent also determined that a section 6662[1] accuracy-related penalty applies.

After trial, respondent conceded on brief that Kiva Dunes is entitled to a section 170(a)(1) charitable contribution deduction for 2002.  Consequently, the issues remaining for our decision are:  (1) The value of the perpetual conservation easement, and therefore, the amount of the allowable deduction under section 170(f)(3)(B)(iii) and (h); and (2) whether a section 6662 accuracy-related penalty applies.

                              FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated by the parties.  The stipulation of facts is incorporated in this opinion, and the stipulated facts are so found.  The tax matters partner of Kiva Dunes is E.A. Drummond, the petitioner.  We will refer to E.A. Drummond as petitioner when we refer to him in his capacity as tax matters partner and Mr. Drummond when we refer to him in his individual capacity.  At the time of the filing of the petition, the principal place of business for Kiva Dunes was in Alabama.

---

[1]All section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

On June 6, 1992, Mr. Drummond purchased real property on the Fort Morgan Peninsula[2] in Baldwin County, Alabama, from the Resolution Trust Corporation for $1,050,000 (RTC property). The RTC property is 12.5 miles west of the intersection of Alabama Highways 59 and 180 and consists of approximately 228 acres south of Highway 180 and approximately 23 acres north of Highway 180.

On December 10, 1993, Mr. Drummond formed D&E Investments, LLC (D&E), an Alabama limited liability company that elected to be taxed as a partnership for Federal income tax purposes. By quitclaim deed dated January 26, 1994, Mr. Drummond conveyed his interest in the RTC property to D&E.

During 1994 D&E initiated the development of a residential resort community on the RTC property consisting of a gated, residential subdivision (the Kiva Dunes subdivision)[3] and a Jerry Pate-designed 140.9-acre golf course (Kiva Dunes Golf Course). The planned resort community also features swimming pools, tennis courts, and beach access.

---

[2]The Fort Morgan Peninsula lies between the Gulf of Mexico on the south and Mobile Bay and Bon Secour Bay on the north. The peninsula is approximately 22 miles long and ranges in width from 1.2 miles to 3.1 miles. U.S. Highway 180 runs east-west through the peninsula. In total, Baldwin County has 32 miles of gulf coastline that is consistently ranked as one of the most beautiful beach destinations in the United States.

[3]The Kiva Dunes subdivision consists of 163 residential lots, 30 of which are on the beach.

During 1995 Kiva Dunes Golf Course was completed and opened to the public,[4] and soon thereafter the individual residential lots began selling.

On December 26, 2002, Mr. Drummond formed Kiva Dunes, an Alabama limited liability company, that elected to be taxed as a partnership for Federal income tax purposes. On December 27, 2002, D&E executed a warranty deed conveying Kiva Dunes Golf Course to Kiva Dunes.

On December 31, 2002, Kiva Dunes placed a perpetual conservation easement (easement) on Kiva Dunes Golf Course and donated the easement to NALT.[5] Kiva Dunes filed a Form 1065, U.S. Return of Partnership Income, for the tax period ended December 31, 2002, on which it claimed a charitable contribution deduction of $30,588,235 for the easement. This amount was based on an appraisal prepared by petitioner's expert in the instant case, Claud Clark (Mr. Clark). Kiva Dunes also reported a $35,000 cash contribution to NALT.

Respondent issued an FPAA to Kiva Dunes determining that it was not entitled to the claimed deduction for the easement or the

---

[4]During 1996 Kiva Dunes Golf Course was rated the No. 2 public golf course in the United States.

[5]A permitted use of the encumbered property could be that of a golf course, a park, or an agricultural enterprise. Contemporaneously with the contribution of the easement to NALT, Kiva Dunes leased Kiva Dunes Golf Course, subject to the easement, to D&E for the purpose of operating the golf course. As of trial, D&E continued to operate the golf course.

$35,000 cash contribution and that a section 6662 accuracy-related penalty applies.[6]

OPINION

A taxpayer is entitled to deduct, pursuant to section 170(a), a qualified conservation contribution made within a taxable year. Sec. 170(c), (f)(3)(B)(iii), (h); see Hughes v. Commissioner, T.C. Memo. 2009-94. As noted above, after trial respondent conceded that Kiva Dunes's grant of the easement is a qualified conservation contribution pursuant to section 170(h) and that Kiva Dunes is entitled to a deduction under section 170(a). Consequently, we need decide only the value of the easement for purposes of determining the amount of the allowable deduction and whether a section 6662 accuracy-related penalty applies.

Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Moreover, the Commissioner's determination of value is normally presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect. See Rule 142(a);

---

[6]Respondent stipulates that petitioner is entitled to a charitable contribution deduction for the $35,000 cash contribution to NALT.

Welch v. Helvering, 290 U.S. 111, 115 (1933); Schwab v. Commissioner, T.C. Memo. 1994-232.[7]

Generally, the amount of a charitable contribution is the fair market value of the contributed property at the time it is contributed. Sec. 1.170A-1(a), (c)(1), Income Tax Regs. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.

In deciding the fair market value of property, we must take into account not only the current use of the property but also its highest and best use. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255 (1934). The highest and best use can be any realistic, objective potential use of the property. Symington v. Commissioner, 87 T.C. 892, 896 (1986).

_____

[7]Petitioner does not argue that sec. 7491(a) applies to shift the burden of proof to respondent. Nonetheless, we decide the instant case on the evidence in the record and need not address which party bears the burden of proof.

Under circumstances where there is a substantial record of sales of easements comparable to a donated easement, the fair market value of the donated easement is based on the sale prices of those comparable easements. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. Where, as in the instant case, there is no established market for similar conservation easements and no record exists of sales of such easements, the regulations provide a method to determine fair market value:

> If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

Sec. 1.170A-14(h)(3)(i), Income Tax Regs.

We have used a "before and after" methodology in evaluating conservation easements. Browning v. Commissioner, 109 T.C. 303, 315 (1997); Hughes v. Commissioner, supra. The parties in the instant case agree that the before and after methodology is the appropriate valuation method to determine the fair market value of the easement.

Additionally, any enhancement in the value of a donor's other property resulting from the easement contribution, or of property owned by certain related persons, reduces the value of

the contribution deduction. Sec. 1.170A-14(h)(3)(i), Income Tax Regs.

Valuation is not a precise science, and the fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. See, e.g., Kaplan v. Commissioner, 43 T.C. 663, 665 (1965); Arbini v. Commissioner, T.C. Memo. 2001-141. In the instant case, each party has offered the report and testimony of an expert witness to establish the value of the easement for purposes of arriving at the proper amount of Kiva Dunes's charitable contribution deduction.

An expert's opinion is admissible if it assists the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. We evaluate expert opinions in the light of the expert's demonstrated qualifications and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). Where experts offer competing estimates of fair market value, we decide how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. Helvering v. Natl. Grocery Co., 304 U.S. 282 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is

based on our own examination of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Petitioner's Expert

Mr. Clark is a professional real estate appraiser and has decades of experience in Baldwin County. He has lived and worked in the immediate vicinity of the subject property for 22 years and owns and has owned property on the Fort Morgan Peninsula. Mr. Clark performs more appraisal work in Baldwin County than any other appraiser, and he has a great depth of knowledge of the comparable properties used in valuing the easement and of the surrounding local real estate market.

Respondent's Expert

Philip Paulk (Mr. Paulk) is a Member of the Appraisal Institute (MAI).[8] He has spent a substantial portion of his appraisal career in Atlanta, Georgia. Mr. Paulk recently moved to, and has offices in, Birmingham, Alabama, 250 miles from Kiva Dunes Golf Course. Mr. Paulk has no particular expertise in Baldwin County, and he has been to the Baldwin County, Alabama, area only twice in connection with his appraisal of the easement.

---

[8]MAI is a designation awarded to qualifying members of the American Institute of Real Estate Appraisers and within the appraisal community is viewed as the most highly regarded appraisal designation. See Estate of Auker v. Commissioner, T.C. Memo. 1998-185.

## Valuation of the Easement

Each party's expert determined before and after values of Kiva Dunes Golf Course and considered the issue of enhancement of other property owned by Kiva Dunes or related parties. Each expert's conclusions as to the fair market value of the easement were computed by subtracting his estimate of the after value and of any enhancement from his estimate of the before value.

## Fair Market Value of Kiva Dunes Golf Course Before Conservation Easement

Each of the experts concluded that the highest and best use of Kiva Dunes Golf Course at the time of the contribution of the easement would have been for the development of a residential subdivision. To reach their respective before value estimates, both experts used a discounted cashflow analysis of estimated revenues and costs associated with the development and sale of lots in a hypothetical subdivision. However, certain of their assumptions differed in important ways; namely, the number of lots available for sale, the average sale price of the lots, and the rate at which the lots would sell. The differences in their assumptions led to a dramatic difference in their respective before value estimates: Mr. Clark's was $31,938,985, and Mr. Paulk's was $10,018,000.[9] We examine the critical assumptions

---

[9]We note that it is not unusual in valuation cases that two expert appraisers reach significantly different conclusions. The instant case poses such a dilemma, and, consequently, the

(continued...)

made by each expert and decide the plausibility of those assumptions in reaching an appropriate before value for Kiva Dunes Golf Course.

### 1. Lots Available for Sale

Mr. Clark determined that 370 lots could be developed for sale in his hypothetical subdivision.[10] Wayne Dyess (Mr. Dyess), the planning and zoning director of the Baldwin County Zoning

---

[9](...continued) credibility of the experts' determinations is of paramount importance. For our purposes, a useful tool with which to measure the reasonableness of the experts' assumptions is the 2005 purchase price for the Woodlands Golf Course (Woodlands). Woodlands was approximately 15 miles (and 6 miles inland) from Kiva Dunes Golf Course. Woodlands was purchased for $17,800,000 for the purpose of developing a residential apartment community and was comparable in size to Kiva Dunes Golf Course.

Petitioner argues that the Woodlands sale price "calls into question the opinions and assumptions of Paulk concerning the Before Value * * * and provides clear evidence that the low Before Value assigned by Paulk was not based in reality." Specifically, petitioner contends "that proximity to the beach is a significant value factor for residential uses * * *. The popularity and high-end residential use of land on the Fort Morgan Peninsula property gives the * * * [Kiva Dunes Golf Course] a substantially higher value than a similar property used for residential (apartment) purposes several miles north, away from the beach." After considering the evidence in the record, we agree.

The experts in the instant case recognize that proximity to the beach imparts a premium to the value of real estate. With Kiva Dunes Golf Course sitting on one of the most beautiful stretches of coastline in the United States, a willing buyer and a willing seller would necessarily anticipate a premium price for the property. Mr. Paulk's before value, which falls $7,782,000 short of the Woodlands sale price, does not reflect adequately the superior locale of Kiva Dunes Golf Course and is not, as petitioner persuasively argues, "based in reality".

[10]The subject property was zoned R-6. This permitted the development of six homes per acre.

Board, agreed.  Mr. Paulk concluded that a local zoning regulation[11] would limit development on the property to 300 lots. Mr. Paulk's conclusion, however, was based on an erroneous interpretation of the regulation.  Specifically, Mr. Paulk's conclusion was based upon his determination that "gross land area" did not include slopes, streams, ponds, watercourses, wetlands, floodways, and floodplains.[12]  Consequently, Mr.

---

[11]The 2002 Baldwin County Zoning Regulations, sec. 23.3(d), provides, in relevant part, as follows:

> (d) Open Space Reservation.
>
> (1) A minimum of 20 percent of the gross land area shall be set aside for permanent open space for the purpose of providing parks, recreational facilities, pedestrian ways, and/or for con-serving sensitive elements of the environment including but not limited to slopes, streams, ponds, watercourses, wetlands, floodways and floodplains.
>
> a. Stormwater detention ponds, retention ponds, or similar holding basins for stormwater shall not be included in the 20-percent open space requirement.
>
> b. A minimum of 50 percent of the required open space must be contiguous and must be usable for passive or active recreation purposes.  The usable open space shall not include steep slopes, streams, ponds, watercourses, wetlands, floodways and/or floodplains.

[12]To the contrary, Mr. Dyess testified that gross land area includes "everything within the boundaries of [a] particular development".  Mr. Dyess further opined on whether 50 percent of the open space in Mr. Clark's conceptual plan was "contiguous and * * * usable for passive or active recreation" purposes as

(continued...)

Paulk's interpretation substantially reduced the available land for lot development because he excluded the lakes and wetlands on Kiva Dunes Golf Course. Ultimately, Mr. Paulk admitted that Mr. Clark's 370-lot subdivision was viable. We conclude that it was reasonable to assume that 370 lots could be developed on Kiva Dunes Golf Course.[13]

---

[12](...continued)
required by the regulation. Initially, Mr. Dyess stated: "In looking at (the plan), not having the exact numbers, typically it doesn't look like they're going to have the 50-percent. To be definitive, we'd want to see the numbers". Ultimately, Mr. Dyess conceded that the plan design could be adjusted to meet the contiguous requirement. Notably, however, he never suggested that such an adjustment would require a reduction in the number of lots available or the elimination of any of the proposed manmade lakes.

[13]Respondent takes the position that the presence of a local beach wildlife inhabitant of the area near Kiva Dunes Golf Course, the federally protected Alabama beach mouse, would have a profound impact on the development of the proposed subdivision. Specifically, respondent contends that Mr. Clark did not account for the time and cost that would be associated with securing the necessary permits in developing the property. From the evidence before us, we are not persuaded that the presence of the Alabama beach mouse would have significantly affected the development of Kiva Dunes Golf Course. We note that Mr. Paulk's report makes no reference to the Alabama beach mouse, and there is no adjustment in Mr. Paulk's values to account for any potential delay or expense associated with the potential impact that the presence of the Alabama beach mouse might have on the development. Indeed, both experts agree that projected sales of the hypothetical lots would have begun closing on Dec. 31, 2003. Moreover, Aaron Valenta, a regional habitat conservation plan coordinator for the Fish and Wildlife Service, testified that Kiva Dunes Golf Course does not fall within the Alabama beach mouse's critical habitat. Ultimately, no evidence or testimony was offered that would support a finding that the presence of the Alabama beach mouse would prevent the development of the proposed subdivision.

2.  <u>Average Lot Price</u>

Mr. Clark concluded that the initial lot price in his hypothetical subdivision would average $170,000.  In reaching this value, Mr. Clark considered a number of variables:  The quality of the lots, market demand, and comparable sales.

Mr. Clark's conceptual plan proposed the enlargement of several lakes and the creation of several pool and recreation areas on Kiva Dunes Golf Course.  Consequently, approximately 70 percent of his proposed lots (258 out of 370) would front the lakes.  Both experts agree that this lake frontage factor alone would have a significant impact on lot value.  Additionally, Jim Edgmon (Mr. Edgmon), an agent of D&E and manager of Kiva Dunes Golf Course, testified that all of the lots would have access to the amenities of the adjacent Kiva Dunes subdivision, including the use of tennis courts, swimming pools, beach walkovers, and dedicated areas on the beach itself.  Moreover, the lots in the hypothetical subdivision would frequently have beautiful views of Mobile Bay.

Mr. Clark also considered the market for house lots in Baldwin County in reaching his initial lot price.  The total population in Baldwin County from 1990 through 2000 (the period shortly before the valuation date) increased 42.87 percent.[14]

---

[14]Mr. Edgmon testified that Baldwin County was the "second-fastest-growing county in Alabama and maybe the top 50 or 70 in
(continued...)

Total households during that same period correspondingly increased 49.38 percent, and the median home price increased 88.2 percent.[15]  Mr. Clark opined that the population surge, coupled with a dwindling supply of available home sites,[16] would increase demand, and the selling price, for the proposed lots.

As a final consideration, Mr. Clark looked to local sales of properties he believed were nearest in quality to the proposed lots.  He noted several 2002 sales of developed lots (land price computed by extraction)[17] in the neighboring Martinique Development (Martinique).[18]  Martinique's sales ranged from $160,000 to $306,700.  Mr. Clark also examined several 2002 and early 2003 sales of "off-of-the-beach" lots at the Kiva Dunes subdivision ranging in price from $110,000 to $160,000.  In

---

[14](...continued)
the country."

[15]The statistical data for population and household growth was included in Mr. Paulk's report.

[16]Mr. Clark testified that neighboring subdivisions were approaching sellout.

[17]Extraction is a method of estimating land value in which the depreciated cost of the improvements on the improved property is estimated and deducted from the total sale price to arrive at an estimated sale price for the land.  Appraisal Institute, The Appraisal of Real Estate 335 (12th ed. 2001).  Mr. Paulk offered no criticism as to Mr. Clark's extraction values.

[18]Martinique is approximately 1 mile east of Kiva Dunes Golf Course off Highway 180.  It is a single-family development with ample lakes, a swimming pool, tennis courts, and convenient access to the beach.

highlighting his Kiva Dunes subdivision comparables, Mr. Clark stressed that their quality and size were inferior to those of the proposed lots.[19]

In contrast, Mr. Paulk determined that the initial lot price in his hypothetical subdivision would average $85,000. In arriving at that number, Mr. Paulk testified, he averaged the 2001 sale prices of just two interior lots sold at the Kiva Dunes subdivision.[20] In other words, Mr. Paulk assumed that two of the least desirable lots in the Kiva Dunes subdivision would be of comparable quality to that of the hypothetical lots.[21] Mr. Paulk's proposed lots would not front the lakes, would not have views of Mobile Bay or any lakes, and would be far removed from the amenities of the Kiva Dunes subdivision. We conclude that Mr. Paulk's assumptions are not realistic because they fail to rely on comparable lot characteristics.

_____

[19]As set forth above, Mr. Clark testified that the majority of lots in the proposed subdivision would front lakes. In his report, Mr. Clark's data is suggestive of the appeal and premium value of lake front property in Baldwin County. For instance, "lake view" lots at Tannin Village averaged $22.88 per square foot, whereas "open view" lots at the Kiva Dunes subdivision averaged only $14.16 per square foot. "Limited view" lots at the Kiva Dunes subdivision averaged a mere $8.65 per square foot.

[20]Lot 113 sold for $108,865, and lot 69 sold for $55,685. The actual average for these lots, $82,275, was then increased 3 percent for appreciation to arrive at a reconciled initial value per lot of $85,000, rounded.

[21]In his report, Mr. Paulk expressly states that his conclusions as to initial lot price are "Based on recent interior lot sales at Kiva Dunes." (Emphasis added.)

Mr. Paulk's testimony at trial is inconsistent with his appraisal in several respects. In his report Mr. Paulk stresses that "Most lots in the [proposed] development will have water views of the onsite lakes". Moreover, Mr. Paulk reports that the proposed subdivision closely resembles Martinique, yet he does not give any consideration to the actual sale prices of its lots in computing his initial lot price. For instance, he lists the average selling prices of lots at developments Morgantown[22] ($74,000), Peninsula[23] ($42,500), and the Kiva Dunes subdivision ($82,275), yet he curiously assigns a value for average lot sales for Martinique at zero.[24] As set forth above, Martinique lots were selling for much more than the residential lots at the Kiva Dunes subdivision.

We conclude that Martinique possesses many of the characteristics of Mr. Clark's hypothetical subdivision and provides the most accurate representation of the quality and value of the proposed lots. Mr. Paulk's assumption that the quality of the proposed lots would mirror that of two inferior

---

[22]Morgantown is a single-family residential development on the south side of Highway 180 approximately one-half mile west of Kiva Dunes Golf Course.

[23]Peninsula is a single-family residential golf course community on the north side of Highway 180 approximately 5 miles west of Highway 59.

[24]Mr. Paulk designates the average lot sale price for Martinique in a separate section as "N/A", the only such property to receive that designation in his report.

lots at the Kiva Dunes subdivision is unavailing.  We conclude that Mr. Clark's analysis is persuasive and that an initial lot price of $170,000 for the hypothetical subdivision is reasonable.

3.  Absorption Rate

Mr. Clark assumed that his 370-lot subdivision would sell out in 10 years, averaging sales of 37 lots per year.  In making his assumption, he compared absorption data from local developments, including the Kiva Dunes subdivision and Martinique.  Mr. Paulk, on the other hand, assumed his 300-lot subdivision would sell out in 15 years, averaging sales of 20 lots per year.  Mr. Paulk appears to have relied exclusively on absorption data from Martinique to forecast his absorption rate.

Both experts relied on Martinique in support of their respective assumptions on the issue of the proper absorption rate.  Indeed, as set forth above, the quality of the lots at Martinique, its amenity package, and its location mirror those of the proposed subdivision.  Accordingly, we conclude that Martinique is a useful gauge of an appropriate absorption rate.

Sales at Martinique were brisk during 2000 (25 sales).[25]  A former sales agent at Martinique to which Mr. Clark's report refers indicated that sales were "slowed by the construction pace", and that "the lots could have sold out much quicker" had

[25]Sales for 2001 totaled 22, and sales reported for half of 2002 totaled 14.

they been sold as vacant lots.  Mr. Clark testified that the demand for vacant lots was "feverish" as existing developments were approaching sellout, and Mr. Paulk's data in his report corroborates Mr. Clark's conclusions.  For instance, by 2005 the Kiva Dunes subdivision, Morgantown, and Martinique had sold out.

Considering that the proposed plan would have had more than three times as many lots available for purchase as Martinique,[26] we conclude that a sales forecast of 37 lots per year is reasonable.

Having found Mr. Clark's assumptions as to the available lots for sale (370), initial lot price ($170,000), and annual rate of lot sales (37 per year) reasonable, we need not address in detail the remaining assumptions made by the experts in deriving their respective before value opinions, as they are largely offsetting.  To illustrate, if we incorporate Mr. Clark's aforementioned assumptions into Mr. Paulk's discounted cashflow computation, leaving intact Mr. Paulk's remaining assumptions as to lot appreciation (3 percent), developer's profit (12 percent), sales commissions (6 percent), closing/marketing costs (3 percent), property taxes ($504/lot), and discount rate (12 percent), Mr. Paulk's before value would amount to $29,948,799.[27]

---

[26]Martinique comprises 104 developed lots.

[27]Mr. Clark estimated lot appreciation at 5 percent; developer's profit at 20 percent; sales commissions at 6 percent;
(continued...)

If we further incorporate respondent's concession on brief as to Mr. Clark's 5-percent lot appreciation rate, Mr. Paulk's before value would increase an additional $2,365,759. Ultimately, with the foregoing substitutions, Mr. Paulk's before value ($32,314,558) would exceed Mr. Clark's before value ($31,938,985) by $375,573.[28]

We conclude that Mr. Clark's testimony is credible and his assumptions are reasonable and amply supported by the evidence presented at trial and in his report. Moreover, we conclude that the Woodlands sale is corroborative evidence of the reasonableness of Mr. Clark's conclusions. Accordingly, we assign a before value to Kiva Dunes Golf Course of $31,938,985.

Fair Market Value of Kiva Dunes Golf Course After Conservation Easement

The experts agree that immediately after the charitable contribution, the highest and best use of Kiva Dunes Golf Course was the continued operation of the golf course.[29] However, in

---

[27](...continued)
closing costs/overhead at 3 percent; and a discount rate at 9.5 percent.

[28]We do not, however, decide that petitioner is entitled to a higher before value than that determined by Mr. Clark.

[29]During 2007 Mr. Clark prepared and submitted a supplemental report in which he opined on the economic health of the golf industry for 2007. At trial, he testified that his new data (information Mr. Clark admits would not have been available to a hypothetical buyer and seller during 2002) suggests that the continued operation of Kiva Dunes Golf Course as a golf course

(continued...)

determining the after value of Kiva Dunes Golf Course, the experts used very different methodologies.  Mr. Paulk used an income approach.  He divided a capitalization rate into a number that he represented was the 2002 net income of Kiva Dunes Golf Course.  Mr. Paulk determined the after value to be $8,808,000. In contrast, Mr. Clark concluded that the economic health of Kiva Dunes Golf Course during 2002 was too poor to support an income capitalization approach.  Instead, he found sales of "comparable" properties that he analyzed and adjusted to reach an after value of $1,050,750.

In determining his after value, Mr. Paulk divided a capitalization rate (12 percent) into a number that he erroneously represented was the 2002 net income of Kiva Dunes

---

[29](...continued)
would not be the highest and best use of the property.  In support of his "new position", Mr. Clark highlighted a recent golf course closure, diminishing rounds played in Baldwin County, and recent losses sustained by several local courses.  On brief, respondent argues vociferously that "[Mr.] Clark's vacillation on the highest and best use of the property after the donation presents insurmountable obstacles for petitioner in establishing the fair market value of the property after the donation."  We disagree.

The fair market value of Kiva Dunes Golf Course should be based on its highest and best use on its valuation date.  See Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(ii), Income Tax Regs.  In other words, the information Mr. Clark used to determine the highest and best use of the property must be limited to information that would have been available to the hypothetical buyer or seller on the date of the donation.  Accordingly, we assign no weight to Mr. Clark's supplemental report or his testimony insofar as it relates to the highest and best use of Kiva Dunes Golf Course.

Golf Course--$1,056,970.[30]  The error was that, in calculating the 2002 net income, Mr. Paulk failed to account for all of the expenses listed on D&E's 2002 tax return,[31] as well as reserves in lieu of depreciation.[32]  The table below summarizes the omitted categories of expense that, when subtracted from Mr. Paulk's computed 2002 net income, result in a negative number:

| Description | Expense |
| --- | --- |
| Salaries & wages | $756,421 |
| Employee benefits | 126,435 |
| Repairs/maintenance | 64,037 |
| Taxes & licenses | 28,565 |

[30]At trial, Mr. Edgmon testified that the 2002 net income for Kiva Dunes Golf Course was a "negative number".

[31]D&E's return was audited for taxable year 2002.  The IRS did not propose any adjustments to the expense categories on the return or challenge whether any of the listed expenses were ordinary or necessary.

[32]We recognize, and both experts agree, that depreciation does not figure into an appraisal value computation.  However, Mr. Paulk admitted that appraisal principles require that an alternative, similar concept be substituted to reflect the economic cost of maintaining and/or replacing equipment required for the operation of the golf course.  Examples of such items relevant for such purposes would include, but are not limited to, maintenance vehicles, maintenance equipment, irrigation systems, and golf carts.  In appraisal parlance, a "reserve" reflects this anticipated cost of replacement and maintenance.  Mr. Paulk made no attempt to determine the amount of an appropriate reserve in his after value analysis.  On brief, respondent argues that an appropriate reserve would not approximate D&E's depreciation deductions because D&E depreciated under an accelerated method (i.e. double declining balance method) and claimed a special depreciation allowance of 30 percent under sec. 168(k).  We agree with respondent that an appropriate reserve does not mirror the claimed depreciation deductions in the instant case.  However, it is not necessary to determine an appropriate reserve as D&E's remaining expenses more than offset D&E's 2002 income.

| | |
|---|---|
| Rent | 104,587 |
| Depreciation/"Reserve" | 594,266 |
| Total | 1,674,311 |

At trial, Mr. Paulk admitted that he was provided D&E's 2002 tax return before he submitted his appraisal. We therefore place no reliance on Mr. Paulk's after value determination.

Mr. Clark used the comparable sales method to reach his after value. The comparable sales method "is based upon the commonsense approach of taking the actual sales prices of properties similar to the subject property and then relating these prices to the subject property." Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979). The fair market value of Kiva Dunes Golf Course is calculated by reference to the sale prices of the comparable properties, adjusted upward to the extent that the property is superior to the comparable property in some fashion and downward to the extent it is inferior in some fashion. See Whitehouse Hotel Ltd. Pship. v. Commissioner, 131 T.C. __, __ (2008) (slip op. at 45); see also Schwab v. Commissioner, T.C. Memo. 1994-232 ("This approach is based on the principle that the prudent purchaser would pay no more for a property than the cost of acquiring an existing property with the same utility."). Mr. Clark made seven adjustments to the prices of his comparables for differences in (1) market conditions, (2) location value, (3) access and visibility, (4) size, (5)

availability of utilities, (6) topographical and wetland characteristics, and (7) financing terms.

Under ideal circumstances, there is an abundance of sales of truly comparable properties made under similar conditions, only minor adjustments are required, and the value is easily derived. However, as in the instant case, when such conditions do not exist, many factors come into play and more adjustments are required. As might be expected, the lack of sales of comparable properties results in a more subjective value, highly dependent on the independent judgment of the individual appraiser.[33]

In reaching his after value, Mr. Clark identified five sales of properties he considered "comparable".[34] Mr. Clark's first comparable was a 186-acre vacant parcel of land in Gulf Shores, Alabama. The property sold on June 4, 1992, for $5,136 per acre, or $1 million. The land was purchased for the purpose of

---

[33]Mr. Clark testified that the limited use for which Kiva Dunes Golf Course could be developed had a profound effect on his adjustments to his comparables.

> [T]his is an eased property that has just about all of its rights stripped from it except recreational type uses, and if this were an uneased property * * * there would be different adjustments, but an eased property under the conservation easement * * * had very limited use. So whether you've got wetlands that you can't do anything with or you've got an eased piece of property that you can't do anything with, you can't do anything with them.

[34]All five of Mr. Clark's sales of comparable properties occurred in Baldwin County.

developing Woodlands as a golf course.  After adjusting the price per acre for market conditions (+66 percent), location (-10 percent), access/visibility (-10 percent), size (-5 percent), utilities (0 percent), topography/wetlands (+5 percent), and financing (0 percent), Mr. Clark arrived at an adjusted value for his first comparable of $7,140 per acre.

The second comparable was an 818-acre vacant parcel of land also in Gulf Shores, Alabama.  The property sold on October 12, 1994, for $6,432,500, or $7,860 per acre.  The property has 1.2 miles of frontage on the south margin of Bon Secour Bay and approximately 1.7 miles fronting on the north row of Highway 180. The land was purchased for the development of a residential community, which included a golf course and tennis center.  After adjusting the price per acre for market conditions (+47), location (-20 percent), access/visibility (-5 percent), size (+10 percent), utilities (-20 percent), topography/wetlands (-20 percent), and financing (0 percent), Mr. Clark arrived at an adjusted value for his second comparable of $8,674 per acre.

The third comparable was a 320-acre vacant parcel of land in Foley, Alabama.  The property sold on January 16, 1997, for $5,313 per acre, or $1,700,000.  This comparable is in an area of significant commercial development.  After adjusting the price per acre for market conditions (+29 percent), location (-10 percent), access/visibility (-10 percent), size (+5 percent),

utilities (-5 percent), topography/wetlands (+5 percent), and financing (+10 percent), Mr. Clark arrived at an adjusted value for his third comparable of $6,409 per acre.

Mr. Clark's fourth comparable was a 190-acre parcel of land in Foley, Alabama. The property was sold on November 19, 1997, for $6,842 per acre, or $1,300,000. Mr. Clark testified that the property was purchased by the Consumer Guaranty Corporation for the purpose of developing a golf course. After adjusting the price per acre for market conditions (+0 percent), location (+5 percent), access/visibility (-5 percent), size (-5 percent), utilities (-20 percent), topography/wetlands (+5 percent), and financing (0 percent), Mr. Clark arrived at an adjusted value for his fourth comparable of $7,112 per acre.

The fifth comparable was a 254-acre parcel of land in Foley, Alabama. The property sold on January 12, 2000, for $11,784 per acre, or $3 million. The site was improved with a number of farm buildings. Mr. Clark testified that the property was commonly referred to as "one of the prettiest sites for a golf course that there could be in Baldwin County." After adjusting the price per acre for market conditions (+5 percent), location (-5 percent), access/visibility (-5 percent), size (0 percent), utilities (-20 percent), topography/wetlands (0 percent), and financing (0 percent), Mr. Clark arrived at an adjusted value for his fifth comparable of $8,670 per acre.

On the basis of the average price of his five comparables, adjusted for differences, Mr. Clark determined an after value of $1,050,750.[35]

We are mindful of the fact that in reaching his after value, Mr. Clark did not take into consideration the highest and best use of his comparables in the traditional sense. He instead selected properties that were purchased for recreational uses that would be permitted on Kiva Dunes Golf Course.[36] In other words, Mr. Clark considered the market forces in Baldwin County an accurate barometer of the highest and best use of a comparable property. We do not find Mr. Clark's analysis in that regard to be "fatal", as respondent contends.

We are satisfied that Mr. Clark's selection of comparables was reasonable under the circumstances and that his adjustments to the prices of the comparables were based upon sound judgment and a detailed knowledge of all the properties mentioned in his report. However, we agree with respondent that an upward adjustment to Mr. Clark's after value is justified in one

---

[35]The average price per acre for the five comparable properties is $7,601. Multiplying that number by the total acreage of the easement, 140.9 acres, results in an after value of $1,070,980, rounded. Mr. Clark inadvertently erred in two respects in reaching his after value number--he miscalculated the average price per acre of his five comparables at $7,500, and he multiplied that number by 140.1 acres.

[36]For instance, the property could be operated as a golf course, a park, or an agricultural enterprise.

respect. Mr. Clark's comparables consist of unimproved land while Kiva Dunes Golf Course's current condition is that of an award-winning golf course. Consequently, an upward adjustment to the prices of the comparables for the cost of turning the unimproved real estate into a comparable golf course property is warranted.

Petitioner contends on brief that the approximate costs of the improvements are reflected in the basis of the golf course real estate ($1,929,456) as reported on Schedule L, Balance Sheet per Books, of Kiva Dunes's 2002 Form 1065. The basis of the golf course real estate improvements is actually $1,339,957. We arrived at this figure by subtracting the portion of the cost basis attributable to the golf course real estate ($589,499) from the 2002 cost basis of Kiva Dunes Golf Course ($1,929,456). We computed the proportional share of the golf course real estate basis by dividing the total acreage for Kiva Dunes Golf Course (140.9) by the total acreage for the RTC property (251) and multiplying that fraction by the total purchase price for the RTC property ($1,050,000).

The foregoing improvement costs ($1,339,957) must be adjusted to account for depreciation. See Wortmann v. Commissioner, T.C. Memo. 2005-227. On Schedule L of its 2000 Form 1065, D&E reported a cost basis in Kiva Dunes Golf Course of $2,501,499. D&E depreciated the costs of improvements on Kiva

Dunes Golf Course for taxable years 2001 ($347,876) and 2002 ($224,168), and its cost basis was correspondingly reduced to $1,929,456 to reflect the deductions.[37] We therefore add to petitioner's cost of improvements ($1,339,957) the depreciation deductions D&E claimed for taxable years 2001 and 2002 to derive a value for the costs of improvements on Kiva Dunes Golf Course ($1,339,957 + $347,876 + $224,168 = $1,912,001).

Accordingly, after adjusting Mr. Clark's after value to account for the improvements, we conclude that the after value for Kiva Dunes Golf Course is $2,982,981 ($1,070,980 comparable value + $1,912,001 depreciation adjustment).

Enhancement

Mr. Clark determined that the conservation easement enhanced property owned by D&E north of Highway 180 by $300,000. Respondent agrees. We shall adjust our final value to reflect that enhancement.

Conclusion

On the basis of our review of all the valuation evidence, giving due consideration to our observation at trial of the witnesses for both parties and to the testimony of the experts

---

[37]D&E did not depreciate the costs of improvements in 2000, and there is no evidence in the record before us that D&E depreciated any costs of improvements to the subject property before 2000.

and their reports, we conclude that the fair market value of the easement is $28,656,004.[38]

We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.[39]

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[38]We reached this number by subtracting our after value ($2,982,981) as well as enhancement ($300,000) from our before value ($31,938,985).

[39]Respondent argues that Kiva Dunes is liable for either a substantial or a gross valuation penalty pursuant to sec. 6662(b)(3) and (e) or (h). Sec. 6662(a) and (b)(3) imposes a 20-percent penalty on that portion of an underpayment which results from a substantial valuation misstatement. There is a substantial valuation misstatement if the value of any property claimed on the return is 200 percent or more of the amount determined to be the correct amount. Sec. 6662(e)(1)(A). Sec. 6662(h) increases the penalty to 40 percent in the case of a gross valuation misstatement. There is a gross valuation misstatement if the value is 400 percent or more of the value determined to be the correct amount. Sec. 6662(h)(2)(A)(i).
We corrected Kiva Dunes's reported value approximately 10 percent. Accordingly, Kiva Dunes is not subject to a valuation penalty.