[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14817
_____

Agency No. 4868-15


CHAMPIONS RETREAT GOLF FOUNDERS, LLC,
RIVERWOOD LAND, LLC, TAX MATTERS PARTNER,

                                        Petitioners - Appellants,

versus

COMMISSIONER OF IRS,

                                        Respondent -Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court
_____

(May 13, 2020)

Before WILSON and GRANT, Circuit Judges, and HINKLE,* District Judge.

---

* Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

HINKLE, District Judge:

The appellant taxpayer claimed a charitable deduction for donating a conservation easement over property that included a private golf course and undeveloped land. The Commissioner of Internal Revenue disallowed the deduction, and the Tax Court upheld the decision. The deduction was proper if the donation was made for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem," or was made for "the preservation of open space . . . for the scenic enjoyment of the general public." I.R.C. § 170(h)(4)(A)(ii) & (iii)(I).

Without the golf course, this easement would easily meet these criteria. Because the Code does not disqualify an easement just because it includes a golf course, we reverse the Tax Court's decision and remand for determination of the proper amount of the deduction.

## I.  Facts and Proceedings

Pollard Land Company bought over 2,000 undeveloped acres along the Savannah River roughly 13 miles north of Augusta, Georgia. In 2002, Pollard conveyed part of the land, 463 acres, to the taxpayer in this action, Champions Retreat Golf Founders, LLC ("Champions"). Champions built a golf course with three nines—one each designed by Gary Player, Jack Nicklaus, and Arnold

2

Palmer. The course opened for play in 2005. It was and still is private—open only to club members and their guests, not the general public.

The golf course occupies roughly two-thirds of the 463 acres. Champions sold 66 homesites on 95 acres on the west side of the course—the side away from the Savannah River. The golf course and homesites are accessible only through a gate that is staffed 24 hours per day.

Roughly 57 acres, consisting primarily of bottomland forests and wetlands, remain undeveloped. This includes riparian land on the Little River, an offshoot of the larger Savannah. Between the Little and Savannah Rivers lies Germain Island. The island consists of both undeveloped land and six holes of the golf course.

The easement property is home to abundant species of birds, some rare, to the regionally declining southern fox squirrel, and to a rare plant species, the denseflower knotweed. Although not itself accessible to the public, the property is readily observable to members of the public who kayak or canoe on the Savannah and Little Rivers.

By 2009, the Champions golf course, like many in the ongoing recession, was struggling financially. Aware of the Tax Court's recent decision allowing a charitable deduction for a conservation easement over golf course property, *see Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145 (2009), Champions contributed the conservation easement now at issue to the North

American Land Trust ("the Trust") in 2010. The Trust is an entity that holds and enforces conservation easements nationwide with the goal of preserving natural habitats and environmentally sensitive areas. The Trust accepted the easement.

The easement covers 348 acres consisting of the undeveloped land and the golf course, including the driving range, but not including the golf course buildings and parking lot. The easement does not include the homesites.

Champions claimed a charitable deduction for the contribution. As a limited liability company, Champions was able to steer the corresponding tax benefit to persons who, in anticipation of that benefit, made capital contributions, thus shoring up Champions' financial position. But the Commissioner of Internal Revenue disallowed the deduction. Champions and a related entity filed this action in the Tax Court against the Commissioner. After a trial, the Tax Court upheld the Commissioner's decision. This appeal followed.

**II. Standard of Review**

We review the Tax Court's legal conclusions de novo and its factual findings for clear error. *See Gustashaw v. Comm'r*, 696 F.3d 1124, 1134 (11th Cir. 2012). "A finding of fact is clearly erroneous if the record lacks substantial evidence to support it, such that our review of the entire evidence leaves us with the definite and firm conviction that a mistake has been committed." *Blohm v.*

4

*Comm'r*, 994 F.2d 1542, 1548 (11th Cir. 1993) (internal citations and quotation marks omitted).

### III. Governing Code Provisions

The Internal Revenue Code allows a deduction for a "qualified conservation contribution." *See* I.R.C. § 170(f)(3)(B)(iii). A "qualified conservation contribution" is a contribution "(A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." *Id.* § 170(h)(1).

A "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of the real property." *Id*. § 170(h)(2). The easement Champions conveyed to the Trust meets this requirement; it restricts use of the property in substantial respects and continues in perpetuity. The Commissioner does not contest this.

The Trust is "a qualified organization." *See id*. § 170(h)(3) (defining this term). The Commissioner does not contest this.

This leaves only one issue: whether this contribution was made "exclusively for conservation purposes." The Code defines "conservation purpose" to mean:

> (i)   the preservation of land areas for outdoor recreation by, or the education of, the general public,
>
> (ii)  *the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem*,
>
> (iii) *the preservation of open space* (including farmland and forest land) where such preservation is--

5

(I)  *for the scenic enjoyment of the general public*, or

(II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy,

*and will yield a significant public benefit*, or

(iv) the preservation of an historically important land area or a certified historic structure.

*Id.* § 170(h)(4)(A) (emphasis added).

This case turns on the italicized provisions. The other provisions do not apply. The land is not available for recreation by or use of the general public. There is no qualifying federal, state, or local government conservation policy that applies to this land; that the county designated the land as greenspace is not enough. This is not historically important land, and there is no certified historic structure on it.

The issues, then, are whether Champions contributed this easement for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem," or for "the preservation of open space . . . for the scenic enjoyment of the general public [that] will yield a significant public benefit."

## IV. Habitat or Ecosystem

### A.  *The Regulation*

The Internal Revenue Code explicitly requires deductions for charitable contributions—including those for conservation easements—to meet regulations

6

adopted by the Secretary of the Treasury. *See* I.R.C. § 170(a)(1). The regulation governing conservation easements is 26 C.F.R. § 1.170A-14. The regulation makes more explicit what one might reasonably construe the Code to mean anyway.

The regulation says a contribution "to protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives" will meet the Code's conservation-purpose requirement. *Id*. § 1.170A-14(d)(3)(i). For the first time on appeal, Champions takes issue with the word "significant," asserting this impermissibly departs from the requirement set out in the Code itself. But even without the regulation, the Code would not be construed to apply to a completely trivial habitat—a few commonly occurring ants plainly would not do, nor would many other species not in need of conservation. Requiring some level of significance thus is unobjectionable. So long as the regulation's use of this term is not construed to mean more than the Code will support, there is no reason to doubt the regulation's validity. Perhaps this is why the regulation has been applied for many years without any challenge to its validity, and why even Champions did not raise this issue in the Tax Court.

The regulation says qualifying significant habitats and ecosystems "include, but are not limited to," those of three kinds. Two are relevant here.

First are "habitats for rare, endangered, or threatened species of animal, fish, or plants." *Id*. § 1.170A-14(d)(3)(ii). Neither the Tax Court nor the parties assert

7

that "rare," "endangered," and "threatened" have, for this purpose, a precise, technical meaning; instead, the terms distinguish species that reasonably warrant protection, on the one hand, from commonly occurring species for which the loss of habitat is not of significant concern. That the regulation explicitly says qualifying habitats are "not limited to" the listed categories supports this flexible reading.

Second are "natural areas which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area." *Id*. The Champions easement runs to the bank of the Savannah River, and on the other side, 700 feet away, is a large national forest.

The third category listed in the regulation covers "natural areas that represent high quality examples of a terrestrial community or aquatic community, such as islands that are undeveloped or not intensely developed where the coastal ecosystem is relatively intact." *Id*. As Champions acknowledges, this provision does not apply here.

The upshot is this. The Code allows a deduction for an easement contributed for "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem." Under this provision and the implementing regulation, Champions is entitled to a deduction if its easement includes habitat for "rare,

8

endangered, or threatened species of animal, fish, or plants," or if the easement contributes to the "ecological viability" of the adjacent national forest.

These are the standards that apply despite the presence of a golf course on part of the property. The Code requires only a "relatively natural habitat . . . or similar ecosystem," not that the land itself be relatively natural. I.R.C. § 170(h)(4)(A)(ii). The regulation, in turn, says a deduction is available even if the land "has been altered to some extent by human activity," so long as "the fish, wildlife, or plants continue to exist there in a relatively natural state." 26 C.F.R. § 1.170A-14(d)(3)(i). The regulation gives as an example the construction of a dam or dike and resulting lake or pond, but neither the Code nor the regulation excludes otherwise-qualifying property with alterations, including, as relevant here, a golf course. *Kiva Dunes* is of limited precedential value—the Commissioner did not oppose the deduction there—but it is consistent, at least, with the view that conservation easements across golf courses qualify for a deduction if they meet the otherwise-applicable standards. *See also PBBM-Rose Hill, Ltd. v. Comm'r*, 900 F.3d 193, 204–05, 209 (5th Cir. 2018) (holding that an easement over a golf course served a conservation purpose but was not deductible because it was not made in perpetuity).

### B.  Rare, Endangered, or Threatened Species

9

The record establishes without genuine dispute that this property is home to abundant species of birds, some rare, to the regionally declining southern fox squirrel, and to a rare plant species, the denseflower knotweed. This is established by the testimony of three experts—two called by Champions and one by the Commissioner—who generally agreed on the underlying facts. The Tax Court explicitly credited the testimony of all three.

One expert observed 61 species of birds on the property, including 26 that are listed as a priority by one or more conservation organizations. These included the eastern whip-poor-will, brown-headed nuthatch, red-headed woodpecker, and prothonotary warbler. The expert saw a wood duck with fledglings, suggesting on-site breeding. The Commissioner's expert saw a wood stork—a federally listed endangered species—though he opined it was just passing through.

The parties have analyzed in detail the placement of the various bird species on conservation priority lists compiled by organizations with expertise in this field. Of critical importance here, though, is not precisely which bird ranks precisely where on one or more of these lists, but the more general question whether the presence of these many species, including some of substantial conservation concern, shows that the property is a significant habitat for "rare, endangered, or threatened species." It plainly does.

For what it's worth, the priority lists were compiled by Partners In Flight ("PIF"), the Atlantic Coast Joint Venture ("ACJV"), the United States North American Conservation Initiative Committee (whose list is denominated and referred to here as the "Watch List"), and the United States Fish and Wildlife Service (whose list is denominated and referred to here as "Birds of Conservation Concern"). The priority designations of the property's various birds include the following: eastern whip-poor-will (ACJV highest priority level, PIF needing management attention, Watch List yellow, Fish and Wildlife Service Birds of Conservation Concern), brown-headed nuthatch (ACJV high priority, PIF planning and responsibility, Fish and Wildlife Service Birds of Conservation Concern), red-headed woodpecker (ACJV moderate, PIF planning and responsibility, Watch List yellow), prothonotary warbler (ACJV moderate, PIF planning and responsibility, Watch List yellow), eastern wood pe-wee (ACJV moderate, PIF management attention), Carolina chickadee (ACJV moderate, PIF planning and responsibility), eastern kingbird (ACJV moderate, PIF management attention), yellow-billed cuckoo (ACJV moderate, PIF management attention), Acadian flycatcher (ACJV moderate, PIF planning and responsibility), blue grosbeak (ACJV moderate, PIF planning and responsibility), brown thrasher (ACJV moderate, PIF planning and responsibility), indigo bunting (ACJV moderate, PIF planning and responsibility), barn swallow (PIF management attention), belting kingfisher (PIF management

11

attention), northern flicker (PIF management attention), blue-gray gnatcatcher (PIF planning and responsibility), Carolina wren (PIF planning and responsibility), downy woodpecker (PIF planning and responsibility), eastern bluebird (PIF planning and responsibility), pine warbler (PIF planning and responsibility), red-bellied woodpecker (PIF planning and responsibility), ruby-throated hummingbird (PIF planning and responsibility), tufted titmouse (PIF planning and responsibility), yellow-throated vireo (PIF planning and responsibility), and eastern Phoebe (PIF planning and responsibility).

The Commissioner's expert takes no issue with the proposition that many birds use the property including some that are worthy of protection. He says, though, that the habitat itself is not relatively natural. For this he focuses on the fairways and greens—they consist of non-native bermuda and bent grass—not the undeveloped portion of the easement, which is, at least for the most part, quite natural.

What matters under the Code and regulation is not so much whether all the *land* is natural, but whether the *habitat* is natural. Indeed, the regulation says it is not disqualifying that the land has been altered, so long as "the fish, wildlife, or plants continue to exist there in a relatively natural state." 26 C.F.R. § 1.170A-14(d)(3)(i). The Commissioner's expert noted nothing unnatural about these birds' existence; they apparently find the habitat quite suitable.

Champions also cites the property's population of southern fox squirrels—a species for which the habitat, including the golf course, is hospitable. The species is not threatened but has suffered declines caused by diminishing habitat, due in part to forest-management practices. The Commissioner discounts the importance of the species, noting that Georgia has a six-month season in which hunters may take up to 12 squirrels per day. But that is not dispositive of the question whether providing the squirrels a habitat is a conservation purpose. That Georgia chooses not to protect the species hardly seems a reason to deny whatever protection is available under *federal* law. Protecting fox squirrels would not alone be sufficient to establish a conservation purpose, but they add to the weight on Champions' side of the scale.

Finally, while the golf course itself is comprised primarily of non-native grasses, the remainder of the easement property is natural and includes a rare species of plant, the denseflower knotweed. The Commissioner has offered no theory under which protecting the denseflower knotweed is not an appropriate conservation purpose.

It is true, as the Commissioner notes, that the knotweed exists on only a limited proportion of the easement—perhaps 7%, with the capacity to occupy up to 17%. But the knotweed that exists, whatever its proportion, is worthy of protection. Full coverage of a species is not required and might even cut the other way; one

13

might reasonably doubt that land consisting entirely of knotweed would provide a relatively natural habitat or would support the many bird species present on this land.

The Commissioner also says part of the golf course drains toward the bottomland where the knotweed is located and that the knotweed thus may suffer harm from the chemicals used on the course. Perhaps so. But the easement explicitly requires Champions to follow the best environmental practices prevailing in the golf industry—an obligation the Trust is entitled to enforce. Moreover, the relevant question is not so much whether chemicals from the course may harm the knotweed, but whether the easement improves the chance that the knotweed will be preserved. The answer is yes for two reasons: first, because the obligation to use best environmental practices would not exist without the easement; and second, because unrestrained development of the land where the knotweed is located would pose a greater risk than the golf course.

Despite the abundant bird species, including many of conservation concern, the declining southern fox squirrels, and the rare denseflower knotweed, the Tax Court said Champions had not established the required conservation purpose. To reach this result, the court considered, or at least discussed in its opinion, only birds seen by both Champions experts—ignoring any bird seen by only one Champions expert, even if the bird was also seen by the Commissioner's expert.

14

The court did this despite explicitly crediting the testimony of both Champions experts. The court offered no explanation for this approach, and we can conceive of none.

The court also ignored a bird that was heard but not seen. The court did not explain how a bird could be heard if not present on or at least near the property.

The Tax Court's implicit finding that the only birds on the property were those seen by both Champions experts is clearly erroneous. More importantly, the Tax Court's conclusion that Champions did not contribute this easement "for the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem"—a conclusion based in part on the clearly erroneous finding of fact—is wrong as a matter of law.

Were it not for the presence of a golf course on part of this property, the assertion that contributing an easement over property with this array of species does not qualify as a conservation purpose would be a nonstarter.

### C.  Support of the National Forest

The easement lies across the Savannah River from a large national forest. The river is 700 feet wide. Birds sometimes fly farther than that. Champions asserts the easement "contributes to . . . the ecological viability" of the forest—an assertion that, if true, would show a conservation purpose. But the Commissioner's

expert testified, and the Tax Court found, that the easement does not support the forest's ecological viability. The finding is not clearly erroneous.

The presence of the national forest across the river is relevant—it supports the species that live on the easement, as the Commissioner's expert acknowledges, and it contributes to the scenic enjoyment from, and public interest in, preventing development of the easement property. But contributing to the ecological viability of the forest, standing alone, does not establish a conservation purpose.

## V.  Scenic Enjoyment

### A.  *The Regulation*

The Internal Revenue Code lists as a qualifying conservation purpose "the preservation of open space . . . for the scenic enjoyment of the general public." I.R.C. § 170(h)(4)(A)(iii). The corresponding regulation says this means, as relevant here, "to preserve open space (including farmland and forest land) . . . [f]or the scenic enjoyment of the general public," so long as the contribution "will yield a significant public benefit."  26 C.F.R. § 1.170A-14(d)(4)(i) & (d)(4)(i)(B).

The regulation continues: "Preservation of land may be for the scenic enjoyment of the general public if development of the property would impair the scenic character of the local rural or urban landscape or would interfere with a scenic panorama that can be enjoyed from a park, nature preserve, road,

16

*waterbody*, trail, or historic structure or land area, and such area or transportation way is open to, or utilized by, the public." *Id.* § 1.170A-14(d)(4)(ii) (emphasis added).

The regulation says scenic enjoyment must be evaluated based on all the circumstances and with flexibility. *Id.* The regulation includes a nonexclusive list of highly abstract factors that may inform the analysis but provide little guidance here. *Id.* More specifically, the regulation says the general public need only have visual, not physical, access to or across the property. *Id.* § 1.170A-14(d)(4)(ii)(B). The "entire property" need not be "visible to the public," but the public-benefit requirement may not be met "if only a small portion of the property is visible to the public." *Id.*

### B. View from the Rivers

The record establishes without dispute that members of the public can and do canoe and kayak on the Savannah River alongside the easement and on the Little River as it runs through the easement. The view from the rivers includes the easement's natural areas as well as the golf course. The record includes a video illustrating the stark difference in the views of the easement property, on the one hand, and the property farther down the Savannah River, on the other. The downriver property includes considerable development—development that few canoers or kayakers would find scenic.

17

One could perhaps debate whether a golf course provides scenic enjoyment. But the natural areas covered by this easement surely do. And the golf course, whose most prominent feature visible from a canoe or kayak on the river is the trees, detracts only a little, if at all. When compared to a condominium building or even private homes, the easement property qualifies as open space providing scenic enjoyment. And preserving relatively natural views along these two rivers—views free of development on the other side as well because of the national forest—serves a public interest.

In asserting the contrary, the Commissioner says the rivers' banks are from three to ten feet high, as if this somehow eliminates the opportunity for scenic enjoyment. The Tax Court took the same approach. But trees, on the one hand, and condos or other buildings, on the other hand, can be seen from a canoe or kayak, even when a river's banks are ten feet high. Indeed, if a ten-foot bank obscures anything, it is the fairways and greens and other non-natural features of a golf course, not the trees. From a kayak on a river with a ten-foot bank, the flat parts of a golf course look just like open land. The notion that the banks somehow prevent scenic enjoyment is a makeweight.

Were it not for the presence of a golf course on part of this property, the assertion that preserving open space alongside rivers with three- to ten-foot banks

18

cannot be "for the scenic enjoyment of the general public" and provide a public benefit would be a nonstarter.

## VI. Conclusion

The bottom line is this: the record establishes that Champions is entitled to a deduction in the proper amount. Because it upheld the Commissioner's disallowance of the deduction, the Tax Court did not address the proper amount, and we express no opinion on it. That will be an issue for the Tax Court on remand.

The Tax Court's decision is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

GRANT, Circuit Judge, concurring in part and dissenting in part:

I join the majority in holding that Champions should receive a deduction for donating its easement for conservation purposes. *See* I.R.C. § 170(h)(1)(C). The easement preserves an "open space" for the public's "scenic enjoyment," and "will yield a significant public benefit." *Id.* § 170(h)(4)(A)(iii). Two publicly accessible rivers cut through and around the easement—providing views of the grassy golf course, trees, and shrubbery that are far more scenic than views of the developed properties downstream. But I must part ways with the majority's decision to reach an issue not argued below and with its separate conclusion that the easement is necessarily a "relatively natural habitat." *Id.* § 170(h)(4)(A)(ii).

*First*, I would not reach Champions' new argument that the governing statute and regulation conflict. "As a general rule, a taxpayer may not address an issue on appeal which it has not first presented to the Tax Court." *Grant v. Comm'r*, 103 F.3d 948, 952 (11th Cir. 1996). To be sure, our cases have also "identified certain exceptional circumstances" where it might be appropriate to use our discretion and "deviate from this rule of practice." *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360 (11th Cir. 1984). Yet the majority opinion leapfrogs any consideration of our normal rule or its exceptions; instead, the opinion gets right to the merits of an argument first raised on appeal. Doing so signals that we are not terribly committed to the requirement that parties raise arguments below. That message gets amplified by the fact that we have no compelling reason to decide Champions' new argument: the opinion already hands

20

Champions the win.  We should not use our discretion to deviate from ordinary practice here.

*Second*, in my view, Champions' easement might not be a "relatively natural habitat."  I.R.C. § 170(h)(4)(A)(ii).  The man-made golf course takes up more than 80 percent of the easement.  In making the course, Champions used non-native grasses, one of which requires the use of large fans to keep it cool in the hot Georgia sun.  And to maintain the course, Champions pumps anywhere from 70,000 to 600,000 gallons of water a day out of the Little River.

Champions also coats its golf course with chemicals—including fungicide, herbicide, insecticide, algaecide, and fertilizer.  To apply these potent chemicals, Champions' staff members sometimes need gloves and respirators.  The chemicals not only artificially change the habitat, but do so in ways that pose what the tax court called "environmental hazards."  In fact, Champions designed the golf course to drain into nearby ponds, creeks, and otherwise undisturbed wetlands.  The golf course drains toward the knotweed (a rare plant that Champions says is protected by the easement), and as the majority itself recognizes, "the knotweed thus may suffer harm from the chemicals used on the course."  Maj. Op. at 14.  Although the majority finds comfort in Champions' pledge to follow the golf industry's best environmental practices, we have little information about what those practices are, or how they stack up to other standards.  And those standards, whatever they are, hardly define the boundary between easements that can and cannot qualify for a deduction under federal law.

21

Ultimately, the majority is willing to look past the easement's unnatural features because of the birds and squirrels living there. The argument has some force, especially because it does appear that the tax court overlooked evidence about the prevalence of these species. But the presence of animals cannot hide that a lot of the easement is highly developed and at least somewhat hazardous to certain species. And no matter how many animals live on the Champions easement, the reality remains the same: with the chemicals, imported grasses, large fans, artificial drainage, and water pumping, it is not at all clear that the easement amounts to a "relatively natural habitat." I do not mean to say that a golf course could never qualify; it's simply not clear that this one does.

As thorny as this "natural habitat" question is, we could spare ourselves the trouble of solving it. After all, we could limit our decision to holding that the easement qualifies for a deduction as an open, scenic space. That is the course I would take. I therefore concur in part and respectfully dissent in part.

22