# United States Tax Court

T.C. Memo. 2022-106

CHAMPIONS RETREAT GOLF FOUNDERS, LLC, RIVERWOOD
LAND, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

————————

Docket No. 4868-15.                    Filed October 17, 2022.

————————

*Vivian D. Hoard*, for petitioner.

*Teri L. Jackson* and *John P. Healy*, for respondent.

SUPPLEMENTAL MEMORANDUM
FINDINGS OF FACT AND OPINION

PUGH, *Judge*: This case is before the Court on remand from the U.S. Court of Appeals for the Eleventh Circuit for further consideration consistent with its opinion in *Champions II*, 959 F.3d 1033, vacating our decision in *Champions I*, T.C. Memo. 2018-146. The Eleventh Circuit concluded that Champions Retreat Golf Founders, LLC (Champions Retreat), is entitled to a charitable contribution deduction under section 170[2] for the donation of a conservation easement in 2010. We must

—————————

[1] This Opinion supplements our previous Opinion *Champions Retreat Golf Founders, LLC v. Commissioner* (*Champions I*), T.C. Memo. 2018-146, *vacated and remanded*, *Champions Retreat Golf Founders, LLC v. Commissioner* (*Champions II*), 959 F.3d 1033 (11th Cir. 2020).

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] determine the proper amount of that deduction, which in turn requires us to value the conservation easement at the time of the donation.[3]

## FINDINGS OF FACT

We summarize facts from our original opinion and set forth additional findings of fact relevant to the valuation issue that remains. Champions Retreat is a Georgia limited liability company with its principal place of business in Augusta, Georgia.

I.  *The Golf Course*

Champions Retreat was formed on November 6, 2001, to develop and operate a golf course. On April 5, 2002, it acquired a 463.3-acre tract of land. On 95.34 acres it developed a neighborhood called Founders Village, and on 365.56 acres it built a 27-hole golf course. It raised an initial $13.2 million for construction of the golf course by selling residential lots in Founders Village. All 67 lots in Founders Village were sold within a few months after construction. The golf course was completed in June 2005.

The golf course has three nine-hole courses, a pro shop, a restaurant, a locker room, a cart storage facility, a driving range and practice area, and a paved parking lot. Gary Player, Arnold Palmer, and Jack Nicklaus each designed one of the nine-hole courses. Mr. Player designed the Creek course; Mr. Palmer designed the Island course; and Mr. Nicklaus designed the Bluff course.[4]

---

[3] After the case was remanded, we asked the parties whether additional briefing or argument was necessary. They responded that the record was closed and the remaining valuation issue fully briefed, and all that remained for us to decide the value of the conservation easement. We are aware that on December 18, 2018, before the case was remanded to us, the United States filed a complaint in the U.S. District Court for the Northern District of Georgia against multiple defendants including Claud Clark III, petitioner's expert witness in this case. *See United States v. Zak*, No. 1:18-cv-5774-AT, 2019 WL 13059907 (N.D. Ga. June 28, 2019). Because neither party brought this to our attention and it is not part of the record before us, we do not consider it in our Opinion.

[4] For purposes of our Opinion we refer to the buildings and the three 9-hole courses together as the golf course and specify, as appropriate, whether we mean the existing 27-hole golf course or a hypothetical 18-hole golf course considered by the experts. We use the generic term "property" when discussing the valuation performed

**[*3]** The Creek course is the westernmost of the three courses and it almost completely surrounds Founders Village. Due east of the Creek course is the driving range. The Bluff course is to the north-northeast of the driving range. The Island course is due east of the driving range. The Little River—an offshoot of the Savannah River that goes around Germain Island—runs through the Island course. Six of the nine holes on the Island course are on Germain Island.

The golf course is a few miles south of the Strom Thurmond Dam, which is operated by the U.S. Army Corps of Engineers. The dam provides flood control for properties along the Savannah River including the golf course. In the past, water released through the dam into the Savannah River flooded the golf course. The Island course flooded more frequently than the other two courses.

The Federal Emergency Management Agency (FEMA) prepares flood insurance rate maps for Columbia County, Georgia, where Champions Retreat is located. According to those maps, at least a portion of the golf course was within a floodplain area. The 2010 version of those maps failed to use the most recent topographic data. At the time of trial, FEMA was revising the maps to account for the most recent data.

II. *Development Restrictions*

The golf course is in Riverwood Plantation, a master planned community that occupies approximately 3,000 acres. A Planned Unit Development (PUD) narrative was prepared in July 1998 by the previous owner, and a PUD zoning governed the development of Riverwood Plantation. The PUD provided that the development "may include either an 18 hole or a 27 hole golf course." The development of Riverwood Plantation was not complete at the time of trial.

The golf course is in a section of Riverwood Plantation called the Reserve. Along with the golf course and Founders Village, the Reserve includes Bishops Court; the Cottages at Riverwood Plantation (Cottages), which adjoin the golf course; and the Bungalows at Champions Retreat (Bungalows). The Cottages and the Bungalows provide guest accommodations. Bishops Court is a residential development of 95 residential lots; none of the lots adjoins the golf

---

by the experts, explaining any differences between what they valued to the extent relevant to our analysis.

[*4] course. As of January 2010, 50 of the 95 lots in Bishops Court had been sold.

The golf course, Founders Village, Bishops Court, Cottages, and Bungalows are subject to certain declarations and restrictions (declarations).[5] Each developed area within the Reserve is subject to the Reserve declaration. And the Reserve is subject to the Riverwood Plantation master declaration. Riverwood Land, LLC (Riverwood Land), is the declarant in all of these declarations.

The Riverwood Plantation master declaration states that the construction of recreational facilities is not guaranteed:

> "Proprietary Recreational Facility" means real property within the Development Plan which is developed into and operated privately or commercially as a recreational facility for golf, tennis, swimming, or other sports and leisure activities. The construction of Proprietary Recreational Facilities is not guaranteed in the development of Riverwood.

The Reserve, Founders Village, and Bishops Court declarations have a slightly different provision: "Except for the construction of a golf club on the Golf Club Property, the construction of recreational facilities is not guaranteed in the development of the Reserve."[6]

The Reserve, Founders Village, golf course, Cottages, and Bungalows declarations define golf club property:

> "Golf Club Property" mean all Parcels, collectively, designated as such on the recorded plats of The Reserve or in the Master Documents. Golf Club Property may be used for golf courses, driving ranges, putting greens, clubhouses, lodges, and other facilities and amenities reasonably associated with a golf club.

Section 1 (Use) of Article VI of the golf course declaration states that "[t]he Parcels and Improvements thereon in Champions Retreat shall be used exclusively for the operation of a golf club, which may

---

[5] The parties refer to the golf course declaration as the "Champions Retreat declaration."

[6] The text quoted is almost identical across the declarations. To the extent variations are not relevant for our analysis, we do not discuss them.

**[*5]** include golf courses, driving ranges, putting greens, clubhouses, lodges, and other facilities and amenities reasonably associated therewith."

The Reserve, Founders Village, golf course, and Cottages declarations all state that "[n]o person or entity shall commit any act in The Reserve, or maintain any Parcel in a manner, which would detract from the playing qualities or aesthetics of the golf club, or constitute an annoyance to persons utilizing its facilities."

Each declaration includes an almost identical reservation regarding amendment by the declarant (Riverwood Land):

> During the Development Period,[7] Declarant reserves and shall have the sole right, without the approval of any Owner or Mortgagee: (a) to amend this Declaration (i) to cure any ambiguity or inconsistency, (ii) to comply with the request of any Mortgagee referred to in Article VII, Section 8 of the Master Declaration within two years from the date hereof, or (iii) in any other manner which does not adversely affect the substantive rights of an existing Owner or Mortgagee; (b) to annex additional land to Champions Retreat and impose additional covenants, conditions and restrictions thereon; and (c) to include in any contract, deed or other instrument any additional covenants, conditions and restrictions applicable to any Parcel which do not lower the standards of this Declaration.

The golf course declaration also permits amendment by the golf course owner in section 1 of Article VII:

> This Declaration may be amended by the Golf Club Owner by the execution of a written instrument in recordable form containing the amendment. During the Development Period, any such amendment shall require the written approval of Declarant. Thereafter, any such amendment shall require the written approval of the Board, the amendment shall be effective when such instrument is

---

[7] The Declarations define the "Development period" as "the period commencing on the date hereof and ending when Declarant has sold or committed to a separate scheme of development all land in the Development Plan." The Development Plan is not part of the record.

**[\*6]** recorded in the real estate records of Columbia County, Georgia.

Each declaration provides that it "may be terminated at any time within the initial twenty (20) years period by recording an instrument signed by Declarant, the Golf Club Owner, and eighty percent (80%) of the Owners."[8]

### III. *The Easement*

On December 16, 2010, Champions Retreat conveyed an easement to the North American Land Trust (NALT) that covered 348.51 acres of the golf course (easement area). The easement area includes 25 of the 27 holes in their entirety, most of the 2 remaining holes, and the driving range. It does not include the parking lot, the pro shop, the restaurant, the locker room, the cart storage facility, the Cottages, or the Bungalows.

The easement document restricts the ways that Champions Retreat can use the easement area, including the types of structures that Champions Retreat can build on the easement area. Among other things, the easement document prohibits division of the easement area into lots.

### IV. *The Subsequent Sale*

In October 2014 the golf course was sold to Tower 3 Golf, Champions Retreat, LLC, for $4,543,000. As a condition of sale, Champions Retreat had to purchase additional land, which cost $187,368, and build a maintenance facility, which cost $1,564,644. The sale price also included inventory of $234,941 and other fixed assets and improvements of $357,585.

Shortly before the 2014 sale, the golf course declaration was amended by Riverwood Land (as declarant) and Champions Retreat (as golf course owner) pursuant to section 1 of Article VII. The amendment deleted section 1 of Article VI, the use restriction, entirely.

### V. *Champions Retreat's Reporting Position*

Champions Retreat claimed a $10,427,435 charitable contribution deduction on its Form 1065, U.S. Return of Partnership

---

[8] The Golf Club Owner is only mentioned in the golf course declaration.

**[\*7]** Income, for the 2010 taxable year, for its grant of the easement to NALT. Champions Retreat included with its Form 1065 a copy of an appraisal performed by Claud Clark III. His appraisal relied on the "before and after" method to value the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). Mr. Clark concluded that the highest and best use of the property unencumbered by the easement was as a residential subdivision. On the basis of that conclusion, he calculated the fair market value of the easement to be $10,427,435.

VI. *Expert Witnesses*

The parties offered expert witnesses to assist us in valuing the conservation easement. Because our valuation hinges on our evaluation of the competing expert opinions, we examine the details of their opinions in our analysis but summarize briefly below.

Petitioner again hired Mr. Clark, who was a certified general real estate appraiser licensed in Alabama, Florida, Georgia, South Carolina, Ohio, and Colorado, this time to prepare an expert report.[9] He has taken a specialized course in conservation easement appraisals, and in the last 15 years has appraised over 200 conservation easements.

We recognized Mr. Clark as an appraiser competent to value conservation easements. He offered his opinion that before the easement grant, the highest and best use of the property was as a partial residential subdivision with an 18-hole golf course, and after the easement grant, a 27-hole golf course. Using the "before and after" method, Mr. Clark opined that the fair market value of the easement was $10,883,789.

---

[9] Petitioner's posttrial briefs are problematic in their presentation of Mr. Clark's opinions. Simply put, counsel for petitioner disregarded the limitations of the rules of evidence and the bounds of the record in this case. In posttrial briefs, petitioner referred to Mr. Clark's expert report as a supplement to his original appraisal even though the original appraisal was not accepted as his expert report. This reinforced our impression that Mr. Clark was serving as an advocate as much as an expert. In addition, petitioner's posttrial briefs rely upon an Internal Revenue Service (IRS) appraiser who did not testify and whose report was not in the record. We allowed petitioner to question Mr. Clark about the basis for his opinion (his reliance on the IRS appraiser); but we also observed that petitioner could not use a testifying expert (or his report) as a back door to admit the expert opinion of someone not testifying. The problem that we face in this case is that respondent did not offer a viable alternative to Mr. Clark's flawed opinion. *See* discussion *infra* Part V.

**[\*8]** Petitioner also offered the opinion of Thomas F. Wingard on the highest and best use of the property. Mr. Wingard has been a real estate appraiser for about 40 years and a member of the Appraisal Institute for more than 30 years. He has special training in conservation easement valuations.

We recognized Mr. Wingard as an expert in conservation easement valuations. He concluded that the highest and best use of the property before the easement was as a partial residential development. He also opined on the correlation between the sale price of the golf course in 2014 and its value in 2010. Mr. Wingard co-authored his expert report with his colleague Martin H. Van Zandt, who did not testify at trial. During voir dire Mr. Wingard explained that he adopted those sections in the report that were written by Mr. Van Zandt.

Respondent offered the opinion of David G. Pope, who has been a real estate appraiser for about 33 years, specializing mostly in hotels and golf properties. Mr. Pope is licensed in Georgia and is a member of the Appraisal Institute as well as the Society of Golf Appraisers (serving as vice president at the time of trial). He had not valued a conservation easement before this assignment but did take a course on valuing them.

We recognized Mr. Pope as an expert in the valuation of real estate. He concluded that the highest and best use of the property before and after the easement grant was the operation of the golf course. According to Mr. Pope, because the highest and best use of the property remained the same before and after, the fair market value of the conservation easement was $20,000.

## OPINION

I.  *Burden of Proof*

Ordinarily, the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). That burden includes proving entitlement to any deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Resolution of the valuation dispute before us does not depend on which party has the burden of proof. We resolve it on a preponderance of the evidence in the record. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340; *Schank v. Commissioner*, T.C. Memo. 2015-235, at \*16.

**[\*9]** II.   *Valuation Principles*

Section 170(a)(1) provides that a deduction is allowed for any charitable contribution that is paid within the taxable year. In general, a taxpayer may not claim a deduction for a charitable contribution of property consisting of less than the taxpayer's entire interest in the property. *See* § 170(f)(3). A taxpayer may deduct the value of a contribution of a partial interest in property, however, if the contribution constitutes a "qualified conservation contribution." § 170(f)(3)(B)(iii). In *Champions II* the Eleventh Circuit found that Champions Retreat is entitled to a charitable contribution deduction; to determine the amount of the deduction we now must determine the value of the easement contributed. We start with the legal principles we must apply.

The amount of a charitable contribution deduction generally is the fair market value of the contributed property at the time it is contributed. Treas. Reg. § 1.170A-1(a), (c)(1). The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. *Id.* para. (c)(2). As this Court has explained, under the willing buyer and willing seller standard, the buyer and the seller are hypothetical persons, rather than specific individuals or entities. *Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated and remanded in part sub nom. JP Morgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Valuation is not a precise science, and the value of property on a given date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

Where, as here, there is no established market for similar conservation easements and no record exists of sales of easements, the fair market value of the donated easement "is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction." Treas. Reg. § 1.170A-14(h)(3)(i). We have used this methodology in evaluating conservation easements. *See, e.g.*, *Browning v. Commissioner*, 109 T.C. 303, 315, 320–24 (1997); *Hughes v. Commissioner*, T.C. Memo. 2009-94, 2009 WL 1227938, at \*4. The parties' experts agree that the before and after method applies here.

**[\*10]** Lastly, when using the before and after valuation method, any enhancement in the value of a donor's other property resulting from the easement contribution, or of property owned by certain related persons, reduces the value of the charitable contribution. Treas. Reg. § 1.170A-14(h)(3)(i).

III.  *Expert Reports Generally*

As is common in valuation cases, the parties offer expert opinions to assist us. An expert's opinion is admissible if it assists us, as the trier of fact, to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a); Rule 143(g). We evaluate expert opinions in the light of each expert's demonstrated qualifications and other evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing estimates of value, we determine how to weight those estimates by examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

In prior cases we have cautioned the parties that we may find that the evidence of value presented by one of the parties is "sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach." *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980); *see also Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts affecting valuation or exaggerates value to incredible levels as unreliable and unhelpful to the Court). We also may accept only those portions of expert opinions that we find reliable. *See Parker*, 86 T.C. at 561–62. And we may determine value on the basis of our own examination of the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

While parties may try "to infuse a talismanic precision," we have characterized the valuation task as "inherently imprecise and capable of resolution only by a Solomon-like pronouncement." *Messing v. Commissioner*, 48 T.C. 502, 512 (1967). It is not an exact science; rather it is a question of judgment dependent on the evidence put before us. *See Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1228 (1987).

With these legal principles in mind, we first consider the experts' opinions on highest and best use of the property before and after the grant of the easement. We then evaluate the experts' opinions on the

**[\*11]** value of the property with and without the easement. We conclude by computing the value of the easement after making those adjustments that are supported by the record.

IV.    *Highest and Best Use*

In determining the fair market value of property, we first must determine its highest and best use. *See Stanley Works & Subs. v. Commissioner,* 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). In determining a property's highest and best use we consider the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. *Olson v. United States,* 292 U.S. 246, 255 (1934). The highest and best use can be any realistic, objective, potential use of the property. *Symington v. Commissioner,* 87 T.C. 892, 896 (1986).

Mr. Clark, Mr. Wingard, and Mr. Pope all began their respective analyses by determining the highest and best use of the property before and after Champions Retreat granted the conservation easement. Mr. Clark determined that the highest and best use of the property before the easement grant was as a residential subdivision with an 18-hole golf course; Mr. Wingard essentially agreed with Mr. Clark; and Mr. Pope concluded that the highest and best use before the easement grant was operation of a 27-hole golf course.

All agree that because of various use restrictions imposed by the easement document, the highest and best use of the property after the easement grant was the continuing operation of a 27-hole golf course.

Almost the entire difference between the parties' competing easement valuations is attributable to their disagreement over the highest and best use of the property before the easement grant. Thus, the first issue that we must decide is the highest and best use of the property before the easement grant. We conclude that petitioner's argument that the highest and best use of the property was a residential subdivision with an 18-hole golf course is stronger.

A.    *Mr. Clark*

Petitioner's first expert, Mr. Clark, opined that the highest and best use of the property in late 2010 was as a residential subdivision with an 18-hole golf course.

[*12] Mr. Clark divided the property into three parts: (1) 81.5 acres consisting of the Bluff course and the 17 existing lots along the Creek course (Bluff course part), (2) 278.44 acres consisting of the Creek and Island courses, and (3) the five rental cottages. He performed a highest and best use and valuation analysis on each part separately.

For the Creek and Island courses part, Mr. Clark concluded that its highest and best use would be to continue as an 18-hole golf course. Since respondent argues that the entire property should be a golf course, both parties in effect agree that the highest and best use of the Creek and Island courses part is to remain a golf course. We adopt their consensus.

For the five rental cottages, Mr. Clark concluded that their highest and best use would be to continue as golf course guest accommodations. Respondent does not contest this, and we therefore conclude that this would be the highest and best use for the cottages.

The parties disagree about only the Bluff course part.[10] Mr. Clark determined that redeveloping the Bluff course part into residential lots would be its highest and best use. He reached this conclusion by examining whether this use was (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. He applied these factors to the property both as vacant and as improved.

Mr. Clark determined that the development of residential lots was legally permissible because the property was zoned PUD. He noted that "no known deed restrictions would further limit the legally permissible uses." In his report, Mr. Clark did not discuss any of the restrictive covenants recorded in the declarations and explained that Champions Retreat's representative advised him that the development would be possible "under any alternative uses."

In concluding that a residential subdivision was physically possible on the Bluff course part, Mr. Clark relied on several factors:

---

[10] Respondent noted that by dividing the property into these three parts, Mr. Clark avoided performing a feasibility analysis of the entire 27-hole golf course, i.e., he failed to evaluate whether it would have been financially feasible to retain the 27-hole golf course (its current use). We think that it may be inferred that Mr. Clark thought that his proposed highest and best use was better than any other use of the property, including its then-current use. And we note that respondent's expert, Mr. Pope, concluded that it was not financially feasible to redevelop the property, mainly on the basis of a supposed lack of demand; he did not perform a numerical financial feasibility analysis for a residential subdivision either.

**[\*13]** total area included, amount of frontage, shape, topography, drainage patterns, soil composition, flood plain status, utilities available, and off-street improvements. Mr. Clark did not discuss these factors in depth but noted that the property was in a planned development, with nearby improvements in very good condition. He also determined that the property was not in a designated flood plain area and that there were no unusual soil conditions. According to Mr. Clark, the surrounding wetlands, rivers, and creeks enhanced the property. He also relied on an engineering plan to confirm that development would be physically possible.

Mr. Clark concluded that recreational use would not be financially feasible. He based this conclusion in part on "the poor operating history financially of the course." After rejecting recreational use, Mr. Clark determined that developing the Bluff course part into residential lots would be financially feasible. The property was in Riverwood Plantation, which he considered a highly developed and desirable community. Mr. Clark opined that the remaining 18-hole golf course enhanced the desirability of a new gated residential development and that there was strong demand for water and golf course oriented property, i.e., lots with river and golf course frontage. He noted that other subdivisions "outside the gate" were successful, and that all the lots in Founders Village were sold in less than a year. Further, he noted that at the time of his valuation, no golf course lots were for sale in the Reserve. This, according to Mr. Clark, signaled "an excellent demand." Finally, he concluded that dividing the Bluff course part into residential lots of varying sizes would be the most productive use.

B. *Mr. Wingard*

Petitioner's second expert, Mr. Wingard, also offered an opinion on the highest and best use of the property before the easement grant: a full or partial residential development.

First, Mr. Wingard concluded that it would be legally permissible to redevelop the property. He noted that PUD zoning allowed greater flexibility to redevelop. Furthermore, Champions Retreat's representative advised Mr. Wingard that any restrictions on redevelopment could be easily terminated.

Second, Mr. Wingard determined that it would be physically possible to redevelop the land. However, he noted that because of some narrow corridors around Founder's Village, redevelopment of that

**[\*14]** portion of the property would be more challenging. In addition, the easternmost portion of the property appeared to be within the flood plain, and, according to Mr. Wingard, the numerous ponds and wetland areas could render a portion of the land unsuitable for development. On the other hand, he noted that wetlands, ponds, and rivers may enhance a residential development. He thought that the Creek course would present the most challenge. Mr. Wingard also took into account that the property had available utilities, including water and sewer, indicating that redevelopment into residential lots was physically possible.

Third, Mr. Wingard concluded that residential development would generate enough profit to warrant the costs involved in the development of the lots and would be financially feasible. He examined lot sales in Riverwood Plantation from 2008 to 2010 and identified an active residential real estate market. He determined that there were 58 lot sales in 2008 with an average lot price of $52,885; 17 lot sales in 2009 with an average lot price of $47,100; and 65 lot sales in 2010 with an average lot price of $50,328. In the last three years before the easement grant, there was a total of 140 lot sales, with an average absorption rate of 3.89 sales per month, which he opined was "positive," considering the national recession. Demand for residential development in the area led him to conclude that redevelopment of the property was financially feasible.

Additionally, Mr. Wingard concluded that residential development would generate a higher return than operation of the property as a golf course. He relied on the golf course's historical income and expenses from 2008 to 2010. He estimated that the golf course was operating at a loss in 2008 to 2010 and "the financial feasibility of the [golf course] . . . [was] questionable." Consequently, he concluded that given the significant demand, residential development of a portion or the entire property would generate a higher return than its current use as a golf course.

Finally, he concluded that the maximally productive use would be as a residential development.

C. *Mr. Pope*

Respondent's expert, Mr. Pope, analyzed the highest and best use of the property before the easement grant both as vacant and as improved. In both scenarios he considered four criteria: legal permissibility, physical possibility, financial feasibility, and maximum

**[\*15]** productivity. Mr. Pope concluded that the highest and best use of the property as vacant was to keep it vacant for future development of a golf course, and as improved with a 27-hole golf course was to continue operating it.

Mr. Pope began by considering whether redevelopment of the property into residential lots would be physically possible. He noted that the property had an irregular shape with more than 50% of the land in a flood hazard area. He opined that with its narrow corridors and location in a flood hazard area, the property would be more difficult to develop for residential use: "An obvious 'physically' possible use . . . is for golf course development. Other . . . uses of the land may include some limited development on the non-flood area portions of the property." At trial he admitted knowing that the FEMA flood maps on which he relied were inaccurate and under review.

Mr. Pope then analyzed legal permissibility, i.e., the zoning and covenants restricting the property. According to Mr. Pope, residential redevelopment of an existing golf course carried "a high level of risk and uncertainty" because of the possibility of implied covenants. Mr. Pope considered the restrictions in the declarations as potential risks in his legal permissibility analysis; but because respondent instructed him to value the property as if these restrictions did not exist, Mr. Pope did not offer any conclusions regarding their impact.

Next, Mr. Pope focused on financial feasibility. He discussed two options: residential development and golf course development. He concluded that there was no immediate financially feasible use for the property as vacant but continued operation as a 27-hole golf course was financially feasible.

According to Mr. Pope, market conditions for the two types of potential uses for the property were the most significant to a financial feasibility analysis. Specifically, Mr. Pope concluded that at the end of 2010 the demand for additional lot development "was limited." To reach this conclusion he analyzed development and sales activity in Founders Village and Bishops Court.

Mr. Pope noted that even though all 67 lots in Founders Village were sold within a few months after they were developed, the pace at which houses were built in Founders Village was much slower: From 2005 to 2010, only 14 houses were constructed, and at the end of 2010, 54 lots were still vacant. According to Mr. Pope, this slow pace of

**[\*16]** construction indicated low demand for additional lots similar to the ones in Founders Village.

Similarly, of the 95 lots in Bishops Court, 43 remained unsold in 2010, and only 33 sold lots had homes built.[11] Thus, Mr. Pope concluded that additional development similar to Bishops Court also was not justified because of low demand.

Mr. Pope then turned to the financial feasibility of a golf course. He noted that "in good real estate markets, golf clubs tend to be constructed as development amenities that drive lot and home prices higher. . . . [D]evelopers typically design golf courses to incorporate unbuildable land, i.e., floodplain land, and to maximize frontage and views for surrounding residential development." According to Mr. Pope, the property was designed this way. Because income from operating a golf course (without a residential development) would not be enough to justify construction costs, Mr. Pope concluded that it would not be financially feasible to develop the property into a golf course if the property was vacant.

However, Mr. Pope concluded that "in December of 2010 continued operation of the property as a private golf club was financially feasible." He based his conclusion primarily on two factors. First, the repayment of membership fees and deposits (a total of about $2 million) would complicate a potential redevelopment of the property. Second, Champions Retreat's revenues from operating the 27-hole golf course exceeded operating expenses and supported an expectation of positive operating profits.

Finally, Mr. Pope concluded that because the continued use of the property as a 27-hole golf course was the only possible use of the property (as improved), it also was the use that maximized the value of the property.

D.    *Analysis of the Highest and Best Use Before the Easement Grant*

Respondent offers three reasons in support of his position that the highest and best use of the property in late 2010 could not have been a residential subdivision: (1) the property was subject to restrictive covenants that limited its use to a golf course; (2) certain physical

---

[11] The parties stipulated that the total number of lots in Bishops Court was 95, but Mr. Pope in his report indicated that it was 92.

**[*17]** qualities of the property, namely flood areas and narrow corridors, would have made redeveloping for residential use difficult; and (3) there was a lack of demand for residential lots in the area at that time.[12] They frame the dispute between the parties, so we will examine each of them in turn.

### 1.    *Restrictive Covenants*

When the before and after method is used, the appraisal of the property before the easement grant "must take into account . . . any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use." Treas. Reg. § 1.170A-14(h)(3)(ii). The golf course, Founders Village, Bishops Court, the Cottages, and the Bungalows each were subject to certain declarations and restrictions. Thus, respondent argues, when the easement was granted, the property already was subject to use restrictions that made the residential redevelopment a remote possibility. This argument is unpersuasive.

First, we agree with respondent that the golf course declaration imposed an express use restriction: Section 1 of Article VI of the golf course declaration provided that the property had to be used "exclusively for the operation of a golf club." However, section 1 of Article VII of that declaration allowed the golf course owner to amend the declaration during the development period with the consent of the declarant. At the time of the grant, Champions Retreat was the owner of the golf course, Riverwood Land was the declarant, and Riverwood Plantation was still under development. Under state law, therefore, Champions Retreat could have amended the declaration to remove the use restriction if necessary. *See Davis v. Miller*, 96 S.E.2d 498, 502 (Ga. 1957) (holding that retention of a right by the subdivision developer to except lots from recorded restrictions on their use was valid and plaintiffs, having purchased with notice of the right to make exceptions, could not complain when exceptions were made pursuant to powers retained).[13]

---

[12] Respondent's expert also observed that any developer would be worried about implied covenants. That may be so, but respondent failed to show the effect of this risk on the value of the lots. And we are unpersuaded that the risk of implied covenants alone would have made redevelopment impossible.

[13] Petitioner argued only that the use restriction could have been amended pursuant to section 2 of Article VII (Amendments by Declarant). Because we conclude that the use restriction could have been removed pursuant to section 1, by the golf

**[*18]** Second, respondent argues that two other provisions in the declarations restricted the use of the property to a golf course. We question this.

The first provision stated that "[n]o person or entity shall commit any act . . . which would detract from the playing qualities or aesthetics of the golf club, or constitute an annoyance to persons utilizing its facilities." It did not impose an explicit use restriction like the one in the golf course declaration, which stated unambiguously that the property "shall be used exclusively for the operation of a golf club." Instead, it cautioned property owners to behave or refrain from behaving in a certain way. And as respondent correctly notes, land use restrictions must be explicit and unambiguous to be enforced. *See Bales v. Duncan*, 204 S.E.2d 104, 106 (Ga. 1974) (holding that there is a presumption in favor of the free use of the land by its owner and that any doubt regarding the applicability of a restrictive covenant should be resolved in favor of the owner); *see also Pritchett v. Vickery*, 156 S.E.2d 459, 462 (Ga. 1967) (holding that use restrictions on private property are not favored and any claim of use restrictions must be clearly established).

A second provision stated that "[e]xcept for the construction of a golf club on the Golf Club Property, the construction of recreational facilities is not guaranteed." This provision is inconsistent with the one in the Riverwood Plantation master declaration, which provided that the construction of recreational facilities was not guaranteed in the development of Riverwood Plantation. Because each declaration allowed the declarant to amend it during the development period to cure an ambiguity or inconsistency, Riverwood Land could have done so. *See Davis*, 96 S.E.2d at 502. Nor did this provision expressly call for construction of a 27-hole golf course, leaving open the possibility that an 18-hole golf course would suffice. At the least this is not a clear use restriction either.

In sum, restrictive covenants did not prohibit redevelopment of the Bluff course part into residential lots.

---

course owner with consent from the declarant, we need not consider whether that would also have been possible under section 2. In fact, when the golf course declaration was amended in 2014, and the use restriction in Article VI was deleted entirely, Champions Retreat (the golf course owner at that time) and Riverwood Land (the declarant) relied on section 1 and not section 2. And Mr. Pope stated in his report that Riverwood Plantation was still under development when the easement was granted (and into 2016).

[*19]       2.       *Irregular Shape and Flood Areas*

Next, respondent focused on the challenges presented by certain physical attributes of the property: the narrow corridors and the flood plain location. According to Mr. Pope, this could have made redevelopment more costly and less attractive to developers than a more typical rectangular parcel. On the other hand, all three experts agreed that developers purposefully design golf courses in a way that allows them to incorporate unbuildable land such as wetlands, ponds, and rivers. This design provides attractive views for the surrounding residential development, maximizes golf course frontage, and therefore increases property value.

While irregularly shaped land and the risk of flooding could have complicated residential development, we are not persuaded that they would have precluded redevelopment of a portion of the golf course into residential lots. Any of the challenges or benefits associated with physical features of the property may (and should appropriately) be reflected in the cost of developing the property. Mr. Pope failed to do this.

       3.       *Demand for the Lots*

Having determined that redevelopment was legally and physically possible, we now consider the financial feasibility of the particular use. The experts provided similar definitions of a financial feasibility test: Generally, if a particular use can produce sufficient revenue to pay all expenses and provide a positive return on investment, that use is considered financially feasible. In evaluating whether residential redevelopment would be financially feasible, all three experts focused on market conditions and in particular on demand for additional residential development in the Reserve. Messrs. Clark and Wingard found sufficient demand for additional lots, and Mr. Pope found demand too low to justify further residential development. Although none of the experts provided a thorough financial feasibility analysis of all potential uses, we are persuaded that demand was sufficient for at least a partial residential development, for the following reasons.

In evaluating demand, the experts analyzed residential lot sales in the years leading up to the grant of the easement. Mr. Pope relied on sales in Founders Village and Bishops Court, and Mr. Wingard analyzed sales in 11 Riverwood Plantation neighborhoods. Although Mr. Clark did not provide a demand analysis in the highest and best use section of

**[\*20]** his expert report, he analyzed lot sales in the subdivisions (including Riverwood Plantation) as part of his before and after method. *See infra* p. 24.

Mr. Pope opined that a better measure for demand was the pace of home construction in the area. He noted that even though all of the lots in Founders Village were sold within a few months after they were developed in 2004, many of them remained vacant at the end of 2010. Moreover, according to Mr. Pope, Champions Retreat had trouble selling lots in Bishops Court, with many lots still unsold at the time of the valuation. Mr. Pope concluded that the low absorption rate for lots in Founders Village and Bishops Court indicated low demand, and therefore further residential development was less financially feasible in 2010.

We are unpersuaded by Mr. Pope's conclusion that the highest and best use of the property could not be a residential subdivision. Primarily, it lacks support in the record. Mr. Pope relied on lot sales (and the pace of home construction) in only two neighborhoods in Riverwood Plantation. And the fact that the lots in one of those neighborhoods—Founders Village—were sold within a few months of development in 2005 undercuts Mr. Pope's conclusions. We agree that a low absorption rate in Bishops Court could signal lower demand for the type of lots that can be found in this particular development; however, we do not think it is sufficient to support a conclusion of a complete lack of demand for any type of residential development in the area.

We also are hesitant to draw conclusions about demand based solely on the fact that some lots remained vacant after they were sold because there are other plausible explanations, and a developer normally is less concerned about what happens to a lot after it is sold. A buyer may acquire a lot intending to build a house immediately or in the future, or may intend to hold it as an investment hoping for appreciation without intending to build on it ever. In other words lot vacancy does not mandate a conclusion that there was no demand.

Mr. Wingard, by contrast, observed an active market for residential lots in Riverwood Plantation. As he noted in his report, there were 58 lot sales in 2008, 17 lot sales in 2009, and 65 lot sales in 2010 (in 11 neighborhoods combined). Mr. Clark also observed a number of sales from 2008 to 2010 (although he did not group those sales year by year). All three experts mentioned other factors important to evaluating demand: desirable location, access to utilities and other infrastructure,

**[\*21]** and population and household income growth. We found these observations well grounded in the available market data, and they persuade us that the demand for additional residential development was sufficient to make further residential development financially feasible.

### E. *Conclusion*

We conclude on the record before us that the highest and best use of the property at the end of 2010 (before the easement grant) was a partial residential development (developing the Bluff course part into residential lots) together with an 18-hole golf course.

Our next step is to determine the fair market value of the property as if put to its highest and best use before and after the grant of the easement.

## V. *Fair Market Value*

Three methods are commonly used to determine fair market value: (1) the market (sales comparison) method, (2) the income method, and (3) the asset-based (replacement cost) method. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325 (2013). The question of which method to apply in a particular case is a question of law. *Id*. at 325–26.

The sales comparison method values a property by comparing it to similar properties sold in arm's-length transactions in or about the same period. *See Estate of Spruill*, 88 T.C. at 1229 n.24; *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Because no two properties are ever identical, the appraiser then considers aspects of the comparable properties such as time of sale, size, or other significant features and makes appropriate adjustments for each to approximate the qualities of the property. *See, e.g.*, *Wolfsen Land & Cattle Co.,* 72 T.C. at 19. The reliability of the sales comparison method depends upon the comparability of the property selected and the reasonableness of adjustments made to establish comparability. *Id*. at 19–20.

The income method values a property by discounting expected cashflow from the property. *See, e.g., Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd without published opinion,* 921 F.2d 280 (9th Cir. 1991). Property value is determined under this method by adding the sum of the present values of the expected cashflows from the property to the present value of the residual value of the property. *See Chapman Glen Ltd.*, 140 T.C. at 327; *see also Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*64. The theory behind the approach is that an investor

**[\*22]** would be willing to pay no more than the present value of a property's anticipated future net income. *See Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 2010 WL 5395108, at \*4, *aff'd*, 493 F. App'x 944 (10th Cir. 2012).

The subdivision development method is a variation of the income method recognized by this Court previously. *See, e.g.*, *Crimi*, T.C. Memo. 2013-51, at \*64–65; *Consol. Invs. Grp. v. Commissioner*, T.C. Memo. 2009-290, 2009 WL 4840246, at \*15; *Glick v. Commissioner*, T.C. Memo. 1997-65, 1997 WL 42357, at \*5. It values undeveloped land by treating the property as if it were subdivided, developed, and sold. *Glick v. Commissioner*, 1997 WL 42357, at \*5.

The subdivision development method consists of six primary steps. *See Crimi*, T.C. Memo. 2013-51, at \*64 n.28 (citing Appraisal Institute, *The Appraisal of Real Estate* 370–76 (13th ed. 2008)). First, the subdivided property's highest and best use is determined. Second, the comparable sales method is used to identify comparable finished (developed) lots and derive a per-lot value. Third, anticipated gross proceeds from the sale of the developed lots are calculated by multiplying the per-lot value by the total number of estimated finished lots. Fourth, expected net proceeds are calculated by reducing the expected gross proceeds by direct and indirect costs and entrepreneurial profit. Fifth, net sale proceeds are discounted to present value at a market-derived rate over the development and absorption period. Sixth, appropriate discounts for lack of marketability, partition, and market absorption are applied where appropriate. The resulting figure equals the indicated value of the undeveloped subdivision. The same process is repeated for all of the subdivisions. The sum of the values for all subdivisions is the value of the entire property.

The replacement cost method values a property by determining the cost to replace it less depreciation or amortization. *See Chapman Glen Ltd.*, 140 T.C. at 327. The parties agree that the replacement cost method is not a reliable method for determining the value of the property in this case.

We begin our analysis of the fair market values before and after the easement grant with a review of the experts' conclusions.

A.     *Fair Market Value Before the Easement Grant*

We concluded above that the highest and best use was as a partial residential development with an 18-hole golf course before the easement

**[\*23]** grant. Because Mr. Pope's valuation of the easement assumes the wrong highest and best use of the property before the easement grant (as a 27-hole golf course), it is not helpful to our valuation. Mr. Clark valued the property as a partial residential development and an 18-hole golf course before the easement grant. Therefore, we will start with his valuation and then consider respondent's criticisms of it.

1. *Mr. Clark*

Mr. Clark divided the property into the same three parts for valuation as for determining the highest and best use: (1) the Bluff course part, (2) the Creek and Island courses, and (3) the five rental cottages.

(a) *Bluff Course Part*

Mr. Clark's hypothetical subdivision development plan subdivided the 81.5 acres of the Bluff course into 193 lots, which, together with the existing 17 lots along the Creek course, comprised a subdivision of 210 residential lots of varying sizes and frontage:

| *Lot Type* | *No. of Lots* |
|---|---|
| Waterfront | 10 |
| Wetlands frontage | 9 |
| Medium golf frontage | 30 |
| Small golf frontage | 2 |
| Acreage small | 2 |
| Large | 11 |
| Medium | 51 |
| Small | 78 |
| Existing lots: acreage golf | 13 |
| Existing lots: cottage lots | 4 |
| **Total** | **210** |

Mr. Clark then performed a discounted cashflow (DCF) analysis of this subdivision to determine the before value. This involved

[*24] estimating the retail price at which lots would sell (using the comparable sales method for this step), projecting the probable absorption rate (i.e., the number of lots that would sell every year), estimating sales and holding expenses, and calculating a discounted present value of the resulting net income stream.

First, Mr. Clark determined development costs of $12,000 per lot using information from the local developer. He increased this number by sales commissions (6%), legal and accounting fees (3%), and taxes. Mr. Clark estimated that the development would be completed in stages over the 2.5 years.

Second, Mr. Clark estimated gross retail value of the lots using the comparable sales method. He found sales of the most comparable lots in Sumter Landing and River Island—competing subdivisions in Evans, Georgia.

| Subdivision | Average Lot Price | Price Range of Lot Sales | Average Lot Size -AC | Average sq./ft. Number of Lots | Lot Sales Date Range | Absorption Rate per Month |
|---|---|---|---|---|---|---|
| Sumter Landing 2009–10 Lot Sales in Evans, GA | $56,662 | $48,000 86,200 | 0.44 0.33 | $3.80 26 | 04/02/09 11/16/10 | 1.33 |
| River Island 2008–10 Lot Sales in Evans, GA | 149,950 | 65,000 360,000 | 0.55 | $9.66 28 | 03/04/08 11/10/10 | 0.87 |
| Riverwood Plantation Lot Sales 2009–10 Interior | 47,214 (2009) 52,921 (2010) | 37,000 108,600 | 0.27 | $4.21 80 | 01/27/09 09/24/09 | 1.67 5.79 |
| Riverwood Plantation Interior and River Front Lots | 77,128 | 45,000 150,000 | Varies | — 390 | Jan 2011 Dec 2016 | Varies |

[*25] Mr. Clark determined that sales of comparable lots ranged from $37,000 to $360,000. He noted a price difference between the riverfront lots and interior lots as well as interior lots and lots fronting the golf course. He estimated a $20,000 upward adjustment for lots with golf course frontage and a $25,000 upward adjustment for sales of comparable nongated lots.

After making adjustments, Mr. Clark concluded that a range from $70,000 to $300,000 was a reasonable retail value for the newly developed lots, and that the gross retail value of all developed lots was $22,467,800, yielding an average of $106,990 per lot:

| Lot Type | No. of Lots | Price |
|---|---|---|
| Waterfront | 10 | $175,000 |
| Wetlands frontage | 9 | 165,000 |
| Medium golf frontage | 30 | 137,000 |
| Small golf frontage | 2 | 103,400 |
| Acreage small | 2 | 110,000 |
| Large | 11 | 105,000 |
| Medium | 51 | 100,000 |
| Small | 78 | 70,000 |
| Existing lots: acreage golf | 13 | 137,000 |
| Existing lots: cottage lots | 4 | 300,000 |
| **Total** | **210** | **$22,467,800** |
| **Average lot price** | | **$106,990** (22,467,800 / 210) |

Third, Mr. Clark analyzed the absorption rates in the comparable subdivisions he identified (Sumter Landing and River Island). He based his estimated absorption rates on sales of comparable lots in the same neighborhood and in comparable subdivisions with lots that have water and golf course frontage. The monthly absorption rate in those developments ranged from 0.87 to 5.79 lots per month. *See* table *supra* p. 24. Mr. Clark also relied on current and future economic trends, considered the overall national housing market, and the

**[*26]** population and household income growth projected over the next five years.[14]

Mr. Clark estimated that the lots in the Bluff course part would be constructed and sold in 2.5 years. In 2011 a total of 58 lots would be constructed and 67 would be sold (58 newly constructed and 9 existing lots), with an average absorption rate of 5.58 lots per month. In 2012, 135 lots would be constructed and 96 would be sold, with an average absorption rate of 8 lots per month. In the first six months of 2013 the remaining 47 lots would be sold, with an average absorption rate of 7.83 lots per month.[15]

Finally, Mr. Clark calculated the discounted present value of the resulting net income stream from the lot sales. From his estimated total sales revenue of $22,467,800 he subtracted estimated total expenses of $4,891,735, resulting in total gross profit of $17,576,065. He then applied a discount rate of 21.25% over the 2.5 years he estimated that it would take to sell all of the lots and concluded that the fair market value of the 81.5 acres and 17 existing lots as of December 16, 2010, was $13,306,170.[16]

(b) *Creek and Island Courses 18-holes (278.44 acres)*

To determine the value of the 18-hole golf course, Mr. Clark used the income method. Because he found a limited number of sales of comparable golf courses, Mr. Clark did not use the comparable sales method.

Mr. Clark's income method uses net income and applies a net income multiplier (a capitalization rate is a reciprocal of the net income multiplier) to determine the fair market value. Therefore, Mr. Clark first had to determine the net operating income (NOI) generated by the property. Champions Retreat's representative provided to Mr. Clark the income and expense statements for 2008 to 2010 for the 27-hole golf

---

[14] Mr. Clark's report includes an Area Data Section which indicates 10.74% population growth, 11.45% income growth, and 8.31% growth in home values between 2010 and 2015.

[15] The total number of lots sold in 30 months is 210; therefore, the overall average absorption rate is 210 / 30 = 7 lots per month or 84 lots per year.

[16] Mr. Clark considered the discount rate of 21.25% reasonable "based on the current loan interest rate, the risks involved with developing a subdivision and the projected holding period of 2.5 years."

[*27] course. Mr. Clark computed historical income (less interest, taxes, depreciation and amortization) for 2008 to 2010 to average $179,522 annually, and, after consulting with several golf course professionals, reduced this number by 20% to reflect that an 18-hole golf course would have slightly less income than a 27-hole golf course.

Next, Mr. Clark applied an income multiplier of 8 (equivalent to a capitalization rate of 12.5%) and determined that the value of an 18-hole golf course on December 16, 2010, was $1,148,936 (($179,522 × 80%) × 8).

#### (c) *Five Rental Cottages*

To determine the fair market value of the five rental cottages Mr. Clark again used the income method. Champions Retreat's representative provided income and expense statements for 2008 to 2010 for the five rental cottages. To calculate the value, Mr. Clark calculated a capitalization rate and applied it to the NOI for the projected year. He concluded that on December 16, 2010, the fair market value of the five rental cottages was $2,355,077.[17]

According to Mr. Clark, the total fair market value of the property as of December 16, 2010, was $16,810,183:

| | |
|---|---|
| 81.5 Acres and 17 lots | $13,306,170 |
| 18-Hole golf course | 1,148,935 |
| 5 Rental cottages | 2,355,077 |
| **Total fair market value before easement grant** | **$16,810,183** |

#### 2. *Analysis*

Respondent offers two main criticisms of Mr. Clark's before valuation. First, respondent argues that the subdivision method Mr. Clark used, along with his failure to use a comparable sales method, make his valuation unreliable. Second, according to respondent, Mr. Clark's absorption rate is not supported by market data and should be

---

[17] The parties agree that because the before and after values of the cottages are the same, they do not affect the fair market value of the easement.

**[\*28]** lower. We disagree with respondent's first point but agree with his second.[18]

### (a) *The Valuation Method*

Respondent argues that the subdivision method is "susceptible to manipulation" and requires an appraiser to make many assumptions. These assumptions, respondent argues, make this method less reliable than the comparable sales method.

The comparable sales method is preferred generally, depending on the situation. *See Estate of Spruill*, 88 T.C. at 1229 n.24 ("In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, *aff'd*, 556 F.2d 1183 (9th Cir. 1977) (unpublished table decision))). But we have recognized that the subdivision development method also is an appropriate method. *See, e.g.*, *Crimi*, T.C. Memo. 2013-51, at \*64–65; *Glick v. Commissioner*, 1997 WL 42357, at \*5.

Respondent criticizes Mr. Clark for mentioning two sales in his expert report but failing to explain why those two sales could not have formed the basis for a valuation under the comparable sales method. But respondent failed to offer his own analysis of those sales using the comparable sales method. Without more in the record, we cannot determine whether the lots sold were comparable, how they might have been similar or different, and whether (or what) adjustments were

---

[18] Mr. Clark was not a compelling witness (and indeed we have criticized him in other cases, *see, e.g.*, *Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2020-148, *aff'd in part, vacated in part and remanded*, No. 21-11251, 2022 WL 3582113 (11th Cir. Aug. 22, 2022)); but we note that respondent did not offer specific criticisms of Mr. Clark's valuation other than those we address in our analysis, relying instead on general statements. For example, respondent did not challenge the comparables Mr. Clark used or suggest alternatives. Nor is there sufficient evidence in the record for us to second guess Mr. Clark's valuation except as we set forth below. We are not valuation experts and can only make adjustments to valuations, or fashion our own valuation, to the extent that the record permits. Here, the valuations by both Mr. Clark and Mr. Pope are flawed; but because Mr. Clark's valuation has more support in the record, we conclude that it was "sufficiently more convincing," *see Buffalo Tool & Die Mfg. Co.*, 74 T.C. at 452, and therefore start with his conclusions and modify them to the extent we can, using our best judgment, given the record before us, *see Estate of Spruill*, 88 T.C. at 1228.

**[\*29]** necessary to make those lots comparable to the property at issue in this case.[19]

Thus, constrained by the facts in the record, and with no competing valuation by respondent, we adopt petitioner's use of the subdivision method as appropriate for the property.

(b)     *The Absorption Rate*

The absorption rate of the lots is an important component of Mr. Clark's DCF analysis. The absorption rate accounts for the fact that the value of the property depends in part on how fast lots are sold. Net sale proceeds must be discounted to present value at a market rate that reflects the period over which lots will be developed and sold. Mr. Clark concluded that all the lots in the proposed subdivision would be developed and sold within 2.5 years with an average absorption rate of 7 lots per month. Respondent argues that this absorption rate is inflated and unsupported (but did not offer a more appropriate rate).

Petitioner's other expert, Mr. Wingard, opined that an absorption rate of 3.89 lots per month was considered high at the end of 2010. Undermining Mr. Clark's conclusions further, the absorption rates in the competing developments that Mr. Clark considered in his report all were lower than his 7-lots-per-month average, varying from 0.87 to 5.79, and he failed to take into account low absorption rates in Bishops Court (although some of the proposed lots in the subdivision differed from the lots in Bishops Court, some were comparable).

We conclude that an absorption rate of 3.5 lots per month—that is, one-half the rate that Mr. Clark assumed—better reflects the evidence before us, including the expert testimony, and is consistent with Mr. Wingard's opinion. This rate assumes that it would have taken five years to develop and sell all the lots in the new subdivision.

Modifying Mr. Clark's calculations to allow an absorption rate of 3.5 lots per month (and five years to develop and sell) results in a fair market value of the 81.5-acre subdivision and 17 existing lots of $10,762,856:

---

[19] Because no two properties are identical, the appraiser has to consider aspects of the comparable properties such as time of sale, size, or other significant features and make appropriate adjustments for each to approximate the qualities of the property at issue. *Estate of Spruill*, 88 T.C. at 1229 n.24; *Wolfsen Land & Cattle Co.*, 72 T.C. at 19.

| [*30] *Mr. Clark's computations based on the absorption rate of 2.5 years* | | | |
|---|---|---|---|
| | *Gross Profit from the Sale of Lots* | *Discount (21.25%)* | *Present Value* |
| Jan–June 2011 | $2,869,688 | 0.908153 | $2,606,116 |
| July–Dec 2011 | 3,927,013 | 0.824742 | 3,238,772 |
| Jan–June 2012 | 4,918,760 | 0.748992 | 3,684,112 |
| July–Dec 2012 | 2,511,804 | 0.680200 | 1,708,529 |
| Jan–June 2013 | 3,348,800 | 0.617726 | 2,068,641 |
| **Total** | | | **$13,306,170** |

| *Recomputation with an absorption rate of five years[20]* | | | |
|---|---|---|---|
| | *Gross Profit from the Sale of Lots* | *Discount (21.25%)* | *Present Value* |
| Jan–June 2011 | $1,434,844 ($2,869,688/2) | 0.908153 | $1,303,058 |
| July–Dec 2011 | 1,963,507 (3,927,013/2) | 0.824742 | 1,619,386 |
| Jan–June 2012 | 2,459,380 (4,918,760/2) | 0.748992 | 1,842,056 |
| July–Dec 2012 | 1,255,902 (2,511,804/2) | 0.6802 | 854,265 |
| Jan–June 2013 | 1,674,400 (3,348,800/2) | 0.617726 | 1,034,320 |
| July–Dec 2013 | 1,434,844 (2,869,688/2) | 0.560989 | 804,932 |
| Jan–June 2014 | 1,963,507 (3,927,013/2) | 0.509463 | 1,000,334 |

[20] For simplicity, we repeat the same pattern of lot sales for the second 2.5-year period. Another way to recalculate the absorption rate would be to repeat the pattern of sales for every six-month period. We performed this calculation too, which yielded a total present value of $10,754,941. *See infra* Appendix. The difference of $7,915 between these two recomputed estimates was not significant in the context of this valuation.

| [*31] | | | |
|---|---|---|---|
| July–Dec 2014 | 2,459,380 (4,918,760/2) | 0.462670 | 1,137,881 |
| Jan–June 2015 | 1,255,902 (2,511,804/2) | 0.420176 | 527,700 |
| July–Dec 2016 | 1,674,400 (3,348,800/2) | 0.381584 | 638,924 |
| **Total** | | | **$10,762,856** |

### B. *Fair Market Value After the Easement Grant*

Mr. Clark and Mr. Pope agree that because of the restrictions placed on the property by the easement document, its highest and best use was as a 27-hole golf course after the easement grant.

#### 1. *Mr. Clark*

##### (a) *27-Hole Golf Course*

To determine the value of the property as a 27-hole golf course after the easement grant, Mr. Clark used the same methodology that he used for valuing the 18-hole golf course, the income method. He relied on Champions Retreat's income and expense statements for 2008 to 2010. He therefore used the same starting annual NOI estimate of $179,522 and the same income multiplier of 8 and estimated that the fair market value under the income method was $1,436,176 ($179,522 × 8).

Then Mr. Clark compared his estimated value under the income method to the sale price of the property in 2014. He concluded that some downward adjustments to the $4,543,000 sale price were appropriate to account for changes to the property after 2010 and for the passage of time. First, because the 2014 sale contract required Champions Retreat to acquire additional land and build a maintenance facility, he subtracted the value of those. Second, he subtracted the value of other fixed assets and improvements made between 2010 and 2014. Third, he subtracted the value of inventory that was transferred as part of the sale. Finally, he made an adjustment to account for the change in the market in the intervening four years. Mr. Clark summarized his adjustments as follows:

**[*32]**

| 2014 Sale Price | $4,543,000 |
|---|---|
| *Less* | — |
| Maintenance facility construction cost | −1,564,644 |
| Additional land purchased for maintenance facility | −187,368 |
| Additional fixed assets and improvements between 2010 and 2014 | −357,585 |
| Food, beverage & golf shop inventory | −234,941 |
| Adjustment for inventory value increase in 4 years (1.5% for 4 years) | −131,908 |
| Market condition adjustment 1.5% for 4 years | −123,993.24 |
| **Total** | **$1,942,560.76** |

Mr. Clark opined that the price at which the 27-hole golf course was sold in 2014 supported his valuation under the income method of the property on December 16, 2010, of $1,436,176.

> (b) *Seventeen Existing Golf Course Lots and Five Rental Cottages*

In valuing the 17 existing golf course lots Mr. Clark used a DCF analysis. He used the same lot values as in his "before" analysis. He estimated a two-year period to sell all 17, with an absorption rate of 8.5 lots per year. He subtracted sales commissions, closing costs, and real estate taxes and applied the same 21.25% discount rate. He concluded that the fair market value of the 17 lots as of December 16, 2010, was $2,135,141.

**[\*33]** Finally, Mr. Clark determined that the fair market value of the five rental cottages would be the same before and after the easement grant, $2,355,077.[21]

#### (c)   *Easement*

Mr. Clark concluded that the fair market value of the easement was $10,883,789:

| Before Value | — |
|---|---|
| 81.5 Acres and 17 existing lots | $13,306,170 |
| 18-Hole golf course | 1,148,936 |
| Five rental cottages | 2,355,077 |
| *Less the After Value* | — |
| 17 Existing lots | −2,135,141 |
| 27-Hole golf course with easement | −1,436,176 |
| Five rental cottages | −2,355,077 |
| **Total** | **$10,883,789** |

### 2.   *Mr. Wingard*

Mr. Wingard also considered the sale of the property in 2014 to arrive at a cash equivalent price of the property on December 16, 2010, after the easement grant. He made adjustments slightly different from Mr. Clark's:

| 2014 Sale Price | $4,543,000 |
|---|---|
| *Less* | — |
| Maintenance facility construction cost | −1,564,644 |

---

[21] Mr. Wingard also determined that the improvements on the property that were not part of the easement would have the same values in both the before and after analyses and thus would not affect the easement value. Respondent does not contest this.

[*34]

| | |
|---|---|
| Additional land purchased for maintenance facility | −187,368 |
| Additional fixed assets and improvements between 2010 and 2014 | −357,585 |
| Food, beverage and golf shop inventory | −234,941 |
| Prepaid monitoring fee to NALT | −113,575 |
| **Total** | **$2,084,887** |

Mr. Wingard noted that the ideal sales comparison method for property with an easement would rely on other similarly sized properties with "identical developmental usage and being similarly encumbered." He stated that comparable properties were difficult to find and concluded that "[a]fter an extensive research, this type of data is not available." Mr. Wingard then concluded that the adjusted sale price of the 27-hole golf course in 2014 (with the easement) may be considered the cash equivalent price of the property in 2010 after the easement grant.

### 3. *Mr. Pope*

Mr. Pope opined that because the highest and best use of the property before and after the easement grant was as a 27-hole golf course, the value in both scenarios would be "relatively similar." Therefore, according to Mr. Pope, the actual value of the property was not a "major issue;" instead, the cost of the "impairment imposed by the Easement" was indicative of a fair market value of the conservation easement. To compare his after-easement valuation to Mr. Clark's we start with his valuation before the easement grant.

To determine the value of the property before the easement grant, Mr. Pope used the income method (the direct capitalization approach) and the comparable sales method. Mr. Pope started with the direct capitalization approach. To project NOI, Mr. Pope relied on Champions Retreat's 2008 to 2010 revenue and expenses, the operating history of the golf course in 2011, and income and expense data from several comparable businesses. The following charts summarize revenue and expenses at the golf course, the data from comparable properties, and Mr. Pope's projections:

| [*35] Revenue | | | | | Projection |
|---|---|---|---|---|---|
| Comparables | | | | | |
| | A | B | C | SGA | |
| Total Revenue | $4,795,371 | $3,319,780 | $4,533,317 | $3,773,775 | — |
| Property History | | | | | |
| | 2008 | 2009 | 2010 | 2011 | |
| Total Revenue | 4,030,088 | 3,625,318 | 4,402,221 | 4,665,344 | |
| — | | | | | $4,486,700 |

| Expenses | | | | | Projection |
|---|---|---|---|---|---|
| Comparables | | | | | |
| | A | B | C | SGA | |
| Total Revenue | $4,084,752 | $2,925,868 | $4,554,899 | — | — |
| Property History | | | | | |
| | 2008 | 2009 | 2010 | 2011 | |
| Total Revenue | 4,012773 | 3,282,306 | 4,224,083 | 4,183,872 | |
| — | | | | | $3,941,787 |

Mr. Pope determined that projected NOI was $544,913 (projected revenue less projected expenses). He then adopted a capitalization rate of 11% and by dividing the property's NOI by 11%, he determined that the (rounded) value of the 27-hole golf course was $5 million. He reduced that value to account for the cost of building a maintenance facility. Mr. Pope acknowledged the higher cost of the maintenance facility that was constructed in 2014 (in connection with the sale of the property) but opined that a reduction of $500,000 was "sufficient to establish an 'average' maintenance complex." He concluded that the value of the 27-hole golf course under the income approach was $4,500,000.

Mr. Pope then turned to the comparable sales approach. He acknowledged that at the end of 2010, the golf course sales market was still suffering from the recent recession and "there was limited sales

[*36] activity" and, consequently, limited comparable sales data. In his appraisal, he used a gross income multiplier analysis in the context of comparable sales and determined that the fair market value under the comparable sales approach was $5,100,000. Mr. Pope then reconciled the values under the income approach and under the comparable sales approach. The resulting value was $4,800,000.

Mr. Pope explained that $4,800,000 reflected the total value of the golf course operation, i.e., it included the (1) real property value, (2) business personal property value, and (3) intangible business enterprise value. To determine the value of just the real property, Mr. Pope made further adjustments. He allocated $500,000 to business personal property (furniture, fixtures, and equipment) and subtracted this amount from $4,800,000 to arrive at the fair market value of the 27-hole golf course before the easement grant of $4,300,000.

Mr. Pope concluded that the easement did not have any "measurable impact in value." He noted that over time, there may be a small amount of value loss because of "impairment associated with . . . transfer fees and monitoring costs for the [e]asement." According to Mr. Pope, the value lost would be $20,000. Thus, he concluded that the fair market value of the property after the easement grant was $4,280,000 ($4,300,000 − $20,000) and the fair market value of the easement was $20,000:

| | |
|---|---|
| *Before Value* | $4,300,000 |
| *Less the After Value* | 4,280,000 |
| **Total** | **$20,000** |

4.    *Analysis*

(a)    *Value Under the Income Method*

Both Mr. Clark and Mr. Pope used the income method to value the 27-hole golf course. The biggest difference in their respective valuations stems from the following two issues: (1) calculation of the NOI each expert used; (2) expenses allocated to building the maintenance facility. We address these issues below.

**[\*37]**                              (1)     *NOI*

Mr. Clark based NOI solely on the financial statements from 2008 to 2010, concluding it was $179,522 annually. Mr. Pope estimated NOI using both 2008–10 financial statements and projections (based on comparable properties), concluding it was $544,913 annually. Mr. Clark multiplied NOI by a net income multiplier of 8 (12.5% capitalization rate) and concluded that the fair market value was $1,436,176. Mr. Pope applied an 11% capitalization rate to his NOI, then subtracted the value of the maintenance facility, and concluded that the value was approximately $4,500,000.

If we plug Mr. Clark's NOI into Mr. Pope's formula (allocating $500,000 for the maintenance facility), we get $1,132,018. Alternatively, if we plug Mr. Pope's NOI into Mr. Clark's formula, we get $4,359,304. This demonstrates that almost the entire difference in the experts' valuations stems from their different NOI estimates.

Neither party was particularly helpful to the Court in determining the appropriate NOI estimate for purposes of applying the income method. For example, respondent failed to contest Mr. Clark's valuation of an 18-hole golf course in the "before" scenario, in which he used historical NOI. And petitioner simply argued that Mr. Pope's NOI was incorrect, ignoring that a potential buyer could take into account not only historical but also projected income and expenses in estimating a property's NOI.

Furthermore, Mr. Pope repeatedly emphasized the importance of relying on historical operating data as opposed to projections in valuing an operating golf course. For example, he said that "[m]arket participants (buyers, sellers, brokers, etc.) for golf properties tend to give significant weight to historical income levels for an operating club" and "the valuation of a mature club like the subject will rely largely on its operating history using the benchmark data primarily as supporting information." But Mr. Pope then estimated an annual NOI three times higher than the average historical annual NOI of the golf course. This contradicts his statements about the importance of historical operating data, and undermines our confidence in his NOI estimate. We have previously held that, in valuing real property, a valuation based on the actual income and expenses of a property is preferable to one based on income and expense estimates ascertained from comparable properties. *See Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243

[*38] (1968), *aff'd*, 406 F.2d 288 (2d Cir. 1969); *LeFrak v. Commissioner*, T.C. Memo. 1993-526, 1993 WL 470956, at *12 n.11.

Mr. Clark used a net income multiplier of 8 (12.5% capitalization rate). And Mr. Pope in his report indicated that capitalization rates for similar properties ranged from 10% to 12.3%. Thus, we conclude that Mr. Clark's net income multiplier of 8, which results in a capitalization rate of 12.5%, was appropriate.

(2)     *Maintenance Facility*

None of the parties' expert reports was helpful in determining the cost of a maintenance facility. Mr. Clark simply relied on the actual cost of building the maintenance facility in 2014, four years post valuation. And Mr. Pope explained that he never had a chance to look at the maintenance facility built in 2014 for the purpose of determining its value. Thus, his estimate of $500,000 is unsupported. In any case, Mr. Clark did not subtract the value of the maintenance facility in his income method, and we agree that it is unnecessary to subtract the value of the maintenance facility under the income method. Therefore, we do not need to determine how much it would cost to build a maintenance facility on the property to apply the income method.

In sum, we think that Mr. Clark's valuation under the income method was more accurate than Mr. Pope's. However, we agree with Mr. Pope's inclination to consider income and expense projections in the computations of the NOI, which Mr. Clark failed to do. Consequently, we conclude that Mr. Clark's estimated value of $1,436,176 should be higher to reflect NOI projections. We now turn to the later sale of the golf course encumbered by the easement.

(b)     *Value Based on Subsequent Sale of the Property*

Mr. Clark and Mr. Wingard each offered an opinion on the correlation of the 2014 sale of the golf course encumbered by the conservation easement to the posteasement value of the property in 2010. Respondent argues that the 2014 sale should not be considered because it came after the valuation date. Respondent cites *Bergquist v. Commissioner*, 131 T.C. 8, 17 (2008), for the proposition that "[s]ubsequent events are not considered to fix fair market value, except to the extent that they were reasonably foreseeable at the date of valuation." We have framed this inquiry as a question of

[*39] relevance.[22] *See, e.g., id*. at 18; *Trout Ranch, LLC v. Commissioner*, 2010 WL 5395108, at \*12; *see also* Fed. R. Evid. 401 (defining evidence as relevant if it has any tendency to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence). And we have admitted, as relevant, evidence of subsequent sales of property within a reasonable time of the valuation date. *See, e.g., Estate of Hillebrandt v. Commissioner*, T.C. Memo. 1986-560, 1986 WL 21780 (admitting evidence of sales of the various parcels of property that occurred five years after the decedent's death); *see also Trout Ranch, LLC v. Commissioner*, 2010 WL 5395108, at \*12 ("[T]he evidence of lot sales within a reasonable period after the date of valuation . . . tends to make a given estimate of the lot prices more or less likely; that is, such evidence is relevant."). Here, we agree with petitioner that the subsequent sale of the property is sufficiently close in time to the valuation date to make that sale relevant. Next, we determine the weight of this evidence.

Mr. Clark and Mr. Wingard made slightly different adjustments to the 2014 sale price to arrive at an adjusted sale price of about $2 million: Mr. Wingard concluded it was $2,084,887, and Mr. Clark, that it was $1,942,560.76. However, only Mr. Clark's adjustments accounted for the passage of time: He subtracted $255,901.24 from the 2014 sale price to reflect appreciation that occurred in the intervening four years. Respondent did not challenge this adjustment; and without anything else in the record that would allow us to assess market changes from 2010 to 2014, we accept this adjustment as appropriate.

Mr. Clark claims that the adjusted 2014 sale price of $1,942,560.76 supports his valuation under the income method of $1,436,176, but he does not explain why he concludes this despite the difference of over $500,000 between the two valuations. The difference may be attributable to Mr. Clark's use of a low NOI in the income method, as we observed above (which undermined our confidence in the reliability of the value he determined under the income method). The

---

[22] We note in addition that we consider the later sale only insofar as it may be relevant to our determination of the easement's value on the date the easement was granted. Thus, the Eleventh Circuit's admonition that we not consider subsequent events that *change* a valuation after the valuation date would not apply. *See O'Neal v. United States*, 258 F.3d 1265, 1271–75 (11th Cir. 2001) (relying on *Ithaca Tr. Co. v. United States*, 279 U.S. 151 (1929), and holding that the value of a deduction claimed under section 2053(a)(3) must be valued as of the date of the decedent's death and that events occurring after the decedent's death that alter the value of the deduction must be disregarded).

[*40] record yields no other insights that would allow us to understand the difference.

We think that the value that Mr. Clark determined by adjusting the 2014 sale price, corroborated by Mr. Wingard's similar conclusion, is a more reliable indication of the fair market value of the golf course after the easement grant. No evidence is more probative of a property's fair market value than its direct sale. *Estate of Newberger v. Commissioner*, T.C. Memo. 2015-246, at *6. We have observed that an arm's-length sale of the property to be valued provides more reliable evidence of fair market value than sales of other comparable properties. *See Ambassador Apartments, Inc.*, 50 T.C. at 243; *see also Hughes v. Commissioner*, 2009 WL 1227938, at *9 (relying on an earlier sale of property in determining the fair market value because a recent sale is the best evidence of fair market value); *Wortmann v. Commissioner*, T.C. Memo. 2005-227, 2005 WL 2387487, at *10 (stating that the most persuasive evidence of a property's value is the actual sale of the property 17 months before the contribution); *Higgins v. Commissioner*, T.C. Memo. 1990-103, 1990 WL 17267 (relying on sale of property four years after the valuation date).

Finally, we observe that the $4,543,000 sale price of the golf course with the easement in 2014 (which by then included additional land and a new maintenance facility, along with other assets and improvements that were not part of the property valued by the experts in 2010) is only slightly higher than Mr. Pope's pre-easement valuation of $4,300,000 as of the end of 2010, a timeframe for which he could not find comparable golf course sales because, he acknowledged, the golf course sales market was still suffering from a recent recession. This further bolsters our conclusion that Mr. Pope's before and after values of the property were excessive (indeed, they were not even playable, much less close to the pin).

Therefore, after considering the entire record before us, we find that the fair market value of the golf course after the easement grant was $1,942,560.

C.    *Fair Market Value: Conclusion*

While we agree with respondent that Mr. Clark's valuation of the easement was too high, we reject Mr. Pope's conclusion that the value of the easement was de minimis because its grant had no adverse effect on the fair market value of the property. Not only did the easement

[*41] document prohibit further subdivision of the property, but it also restricted future construction of additional buildings and other structures on the property. Thus, even assuming that in late 2010 there was no demand for a 210-lot subdivision, we are hard pressed to imagine that a prospective purchaser would not have considered easement restrictions material in determining the purchase price.

On the basis of the record before us, giving due consideration to our observation at trial of the fact witnesses and the experts, we conclude that the fair market value of the easement in 2010 was $7,834,091:

| *Before Value* | — |
|---|---|
| 81.5 Acres and 17 existing lots | $10,762,856 |
| 18-Hole golf course | 1,148,936 |
| Five rental cottages | 2,355,077 |
| *Less the After Value* | — |
| 17 Existing lots | −2,135,141[23] |
| 27-Hole golf course | −1,942,560 |
| Five rental cottages | −2,355,077 |
| **Total** | **$7,834,091** |

As a check on our analysis, we also computed the present value of the 193 lots that could not be developed because of the easement. The resulting number, $8,627,715, confirms the appropriateness of our valuation above.[24] Adjusting this value by $793,624, i.e., by the difference in value of an 18-hole course before the easement grant and a 27-hole course after the easement grant ($1,148,936 − $1,942,560), results in $7,834,091, the fair market value of the easement.

---

[23] Although we have adjusted the absorption rate that Mr. Clark applied in his before valuation, we will not do so here. It is reasonable to assume that 17 existing lots would sell faster than 193 lots that first had to be developed.

[24] We calculated that the present value of the Bluff course part (193 newly developed lots and 17 existing lots) was $10,762,856. *See supra* p. 30. And the value of the 17 existing lots was the same before and after: $2,135,141. *See supra* p. 33. Thus, the value of just 193 newly developed lots was $8,627,715 ($10,762,856 − $2,135,141).

**[*42]** Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

**[\*43]**                                    APPENDIX

| Recomputation with an absorption rate of five years | | |
|---|---|---|
| | *Gross Profit from the Sale of Lots* | *Discount (21.25%)* | *Present Value* |
| Jan–June 2011 | $1,434,844 ($2,869,688/2) | 0.908153 | $1,303,058 |
| July–Dec 2011 | 1,434,844 (2,869,688/2) | 0.824742 | 1,183,376 |
| Jan–June 2012 | 1,963,507 (3,927,013/2) | 0.748992 | 1,470,651 |
| July–Dec 2012 | 1,963,507 (3,927,013/2) | 0.6802 | 1,335,577 |
| Jan–June 2013 | 2,459,380 (4,918,760/2) | 0.617726 | 1,519,223 |
| July–Dec 2013 | 2,459,380 (4,918,760/2) | 0.560989 | 1,379,685 |
| Jan–June 2014 | 1,255,902 (2,511,804/2) | 0.509463 | 639,836 |
| July–Dec 2014 | 1,255,902 (2,511,804/2) | 0.462670 | 581,068 |
| Jan–June 2015 | 1,674,400 (3,348,800/2) | 0.420176 | 703,543 |
| July–Dec 2015 | 1,674,400 (3,348,800/2) | 0.381584 | 638,924 |
| **Total** | | | **$10,754,941** |